E. C. Laster, and Mrs. E. C. Laster, Petitioners, et al.,[1] *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 96550, 97442, 97713, 97714, 97716, 100340, 100341.

Promulgated December 27, 1940.

---

[1] Proceedings of the following petitioners are consolidated herewith: E. C. Laster, Inc. (Dissolved); Edward Carroll Laster, Transferee; Carolyn Faust Laster, Transferee; E. C. Laster, Transferee; E. C. Laster; and Mrs. Eugenia F. Laster.

*Harry C. Weeks, Esq.*, and *R. B. Cannon, Esq.*, for the petitioners.
*D. D. Smith, Esq.*, for the respondent.

OPINION.

## Issue I.

DISNEY: The first issue involves amounts disallowed by the respondent for intangible drilling and development costs deducted by the petitioners on account of the Lambert, Taylor, Brown, Coates, and Rollins wells upon the ground that the wells were drilled under turnkey contracts. The petitioners do not deny that amounts paid by an operator for the drilling of a well under a turnkey contract must be capitalized. The first point argued by the petitioners upon brief is that they did not in any instance receive a completed and equipped well, and, accordingly, the wells were not drilled under turnkey contracts as determined by the respondent.

The contract entered into on October 22, 1935, under the terms of which the Lambert wells were drilled, was construed in *Retsal Drilling Co.*, 42 B. T. A. 1057, in connection with the deductibility of intangible drilling and development costs in the drilling of two wells on the Crosbar-Maxwell lease. Under that contract the leaseholder agreed to swab the wells in and to furnish water, fuel, tanks, flow lines, and a man to supervise the drilling of the sand area and the running of casing. We said that the Retsal Drilling Co. had contracted for a finished job and that its contract obligation to furnish items necessary to complete the work did not operate to convert the contract into one for the employment of labor and the purchase of equipment. So holding, we decided that no part of the amounts paid to the contractor was deductible as intangible drilling and development costs. The petitioners did not in any of the other contracts involved herein agree to furnish more than they agreed to furnish under the contract for the drilling of the Lambert wells.

The petitioners contend, however, that, aside from the question of whether the agreements were turnkey contracts, the amounts are deductible under article 23 (m)–16 of Regulations 94, since they were incurred for wages, fuel, hauling, etc., under a contract for the drill-

ing of wells to a specified depth at a specified price per foot. The same contention was made in the *Retsal Drilling Co.* case and it was answered by pointing out that the contracts were for the drilling of wells to a designated sand and not to a specified depth and could not be classified as footage contracts. Here the contracts for the Lambert wells and the Rollins well obligated the contractor to drill wells to the Woodbine Sand. The written contract under the terms of which the Coates wells were drilled could not be produced at the hearing, and the testimony on the contents of the contract does not cover the point. There is testimony that the terms of the oral agreements under which the Taylor and Brown wells were drilled provided for the drilling of the wells to "a certain depth." Petitioners do not rely, however, upon this testimony as proof that the wells were to be drilled to depths ascertainable in a manner other than under the Lambert contract, that is, to a specified sand, and there is nothing of record proving otherwise. Accordingly, petitioners have not shown that the Coates, Taylor, and Brown wells were to be drilled otherwise than to a specified sand.

The first issue is controlled by our decision in *Retsal Drilling Co.*, *supra*, and, following that case we sustain the action of the respondent in disallowing the amounts in controversy.

### Issue II.

The amount of $633 involved in the second issue is alleged by the petitioners to be deductible as an intangible drilling and development cost under the provisions of article 23 (m)–16 (a) (1) of Regulations 86, reading, to the extent material here, as follows:

* * * All expenditures for wages, * * * incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. Examples of items to which this option applies are, all amounts paid for labor, * * * in the construction of such derricks, tanks, pipe lines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas. * * * For the purpose of this option labor, * * * are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. * * *

The respondent cites article 23 (m)–16 (c) (1) in contending that the item should be capitalized. This regulation provides, in part:

* * * The options do not apply to any expenditure for wages, fuel, repairs, hauling, supplies, etc., in connection with equipment, facilities, or structures, not incident to or necessary for the drilling of wells, such as structures for storing or treating oil or gas. These are capital items and are returnable through depreciation.

The petitioners extend the regulations to wages paid to prepare a well for the production of oil, including pumping equipment necessary to extract the oil from the ground, and the respondent, by implication, and without extended discussion of the point, confines the regulations to drilling operations, exclusive of pumping equipment. As we view the question it will not be necessary for us to interpret the regulations to determine their meaning on the point of difference between the parties.

The bid of the Continental Supply Co. for the installation which Laster accepted was a lump sum for a completed job, ready for operation. This is shown beyond serious question by statements appearing in the bid that the work was to be a "Turnkey Installation."

The situation does not differ from a turnkey contract for the drilling of a well, in which the contractor for a lump sum furnishes equipment and labor for a completed job. In such cases, the wages paid by the contractor are not the costs, as such, of the leaseholder and are not deductible by him under the regulations as intangible drilling and development costs. *Grison Oil Corporation* v. *Commissioner*, 96 Fed. (2d) 125; certiorari denied, 305 U. S. 613; *O–W–R Oil Co.*, 35 B. T. A. 452. The respondent committed no error in refusing to allow the item as a deduction for intangible drilling and development costs.

## Issue III.

The difference between the parties on this issue is whether the basis of E. C. Laster in three oil payments acquired in the dissolution in 1936 of E. C. Laster, Inc., is recoverable through allowances for depletion, as determined by the respondent, or whether receipts under the oil payments are taxable only when and to the extent that they exceed cost. The same question was considered and decided adversely to petitioner's contention in *T. W. Lee*, 42 B. T. A. 1217. *Commissioner* v. *Laird*, 91 Fed. (2d) 498, relied upon by the petitioner here, was considered by us in reaching our decision in the *Lee* case. On this issue we sustain the action of the respondent.

## Issue IV.

The parties are in agreement that where, as here, there is a tax-free exchange, the property acquired takes the basis of the property given up. Secs. 113 (a) (6), 113 (b), and 114 (a), Revenue Act of 1936. The respondent followed the statute by assigning to the leases, including well equipment received, the basis of the property petitioner exchanged therefor, but allocated the amount thereof to

the properties acquired according to the relative values of the properties exchanged, and in doing so decreased the basis for well equipment and increased the basis for the leaseholds, exclusive of well equipment. The petitioner alleges that respondent should not have altered the basis he had in his original well equipment. In other words, that he should have assigned to the newly acquired well equipment the basis he had in the well equipment given up in the exchange.

The petitioner's argument is based upon the theory that there was an exchange of well equipment for well equipment and leasehold rights for leasehold rights. There is no support in the record for such a conclusion. The showing is that three leaseholds were exchanged for four leases, including the well equipment on each. There is some evidence of the value of two of the leaseholds exchanged by petitioner, but no evidence on the value of the other leaseholds or any of the well equipment.

The statute provides for a reasonable allowance for the exhaustion of property used in a trade or business. Sec. 23 (1), Revenue Act of 1936. Section 113 (a) (6) of the same act provides, in effect, that when property is received in a nontaxable exchange the basis of the property given up "shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange." Under a like provision of the 1926 Act, we held in *Florence W. Hunt*, 35 B. T. A. 1042, that upon the exchange in a nontaxable transaction of shares of common stock of one corporation for common and preferred stock of another corporation, the basis of the stock given up should be allocated between the two classes of new stock according to its fair market value at the time acquired. See *Christian W. Von Gunten*, 28 B. T. A. 702; *P. L. Wheeler*, 32 B. T. A. 917. Where a combination of depreciable and nondepreciable property is acquired for a lump sum, so much of the total consideration is assigned as a basis for the exhaustible property as its value bears to the aggregate value. *Hazeltine Corporation*, 32 B. T. A. 4.

If it could be held that there was an exchange of well equipment for well equipment, as alleged by the petitioner, there would still remain the question of how the basis of petitioner in the equipment on the leases should be allocated to the depreciable property on the four leases. Some sort of a division would be necessary under the circumstances, but none is suggested by petitioner. The method employed by the respondent does not reduce the basis petitioner had in the whole property exchanged. The amount by which the basis on the well equipment was reduced was added to the remainder, so

that the entire basis will eventually be recouped—the equipment through allowances for depreciation and the leasehold rights by way of depletion, or as an offset in the event of sale. The respondent's allowances for depreciation on the equipment are sustained.

## Issue V.

The underlying theory of respondent's action in taxing petitioner E. C. Laster, Inc., on a gain of $11,000 realized in the drilling by F. H. Brown of two wells on the Brown lease under turnkey contracts for $13,500 each, payable out of oil produced by all of the wells on the lease, is that there was an exchange of an oil payment, payable out of a fully depleted leasehold, for completed oil wells having a fair market value of $22,000. No attempt was made by petitioner to prove that the leasehold had a basis. We are not aware of the method pursued by respondent in determining the fair market value of the wells. Upon brief he contends that the evidence contains no proof that the oil payments did not have a fair market value of $22,000 and that, therefore, the wells, upon completion, had a value of that amount. The respondent determined a fair market value of $22,000 for the completed wells in connection with his determination of the deficiency and no evidence was offered by the petitioner to establish a different valuation. The record contains no showing that he ever determined a value for the oil payments, as such. There is indication, however, that respondent's valuation of the wells is based upon an equal value for the oil payments. The respondent argues that there was a transfer of an interest in the lease for completed wells, resulting in taxable gain under *Midfield Oil Co.*, 39 B. T. A. 1154.

The *Midfield Oil Co.* case involved an exchange of an oil payment, limited in amount, for an overriding royalty giving the holder the right to a return on his investment so long as oil or gas might be produced from the property. The taxpayer admitted a gain measured by the difference between the fair market value of the overriding royalty and the unrecovered cost of the oil payment if the transaction was not a nontaxable exchange under section 112 (b) (1) of the Revenue Act of 1934. We held that the exchange was not of properties of like kind and recomputed the gain under the admission of the taxpayer.

The only consideration received by the drilling contractor here for the drilling of the wells was a right to share in the proceeds of production of the lease to the extent of the oil payments. This interest in oil in place was something growing out of rights acquired by the lessees from the fee owner, but did not give the contractor

an interest in the lease by purchase or otherwise, as contended by the respondent. *Dearing* v. *Commissioner*, 102 Fed. (2d) 91.

In *Transcalifornia Oil Co., Ltd.*, 37 B. T. A. 119, percentage interests in the proceeds of production of a well to be drilled were issued as additional consideration for assignment of the lease and for legal and supervisory services performed and to be performed in the drilling of the well, and for cash. All of the cash was to be used to finance drilling operations and purchase oil well equipment. Each 1 percent interest was liable for $10 per month to pay taxes and the cost of operating the well. All of the cash received from the disposition of percentage interests was expended in the drilling of the well. The Commissioner contended that royalty interests were disposed of in sales and that, as the lease had no recoverable base, the total amount received constituted taxable income. We held that the cash was received subject to an implied trust to use it in the drilling of the well and, as all of it was expended for that purpose, no income was received by the lessee subject to tax.

The *Transcalifornia Oil Co.* case and this one do not differ in substance. In the former cash was invested in a well for a right to participate in its production so long as it continued to produce oil. The holder of the oil payment had a capital investment in oil in place and was entitled to deductions for depletion. *Palmer* v. *Bender*, 287 U. S. 551. Upon the completion of the well the lessee held title to it and was required to share its production with the percentage certificate holders, according to their interests. Here the drilling contractor, instead of advancing cash to the lessees for drilling costs in consideration of oil payments, paid drilling costs from his own funds and turned over to the lessees completed wells for oil payments limited in amount. The lessees here received nothing more than completed wells, the cost of which constituted an investment of a third party for a right to share in production. The wells no doubt enhanced the value of the lease, but, as we held in effect in *Transcalifornia Oil Co., supra*, that fact alone does not make the transaction taxable.

On this issue we hold for the petitioner.

## *Issue VI.*

The parties differ under this issue only upon whether it is controlled by *Thomas* v. *Perkins*, 301 U. S. 655, or *Anderson* v. *Helvering*, 310 U. S. 404. The respondent contends that the *Anderson* case governs, upon the assumption that the oil payment was secured by a lien upon the wells drilled, Nos. 5 and 6, and was payable out of two-sixths of the production of the six wells on the lease.

The respondent's contention as to the lien appears to be based upon a single sentence in the drilling contract reading as follows: "The Contractor is hereby granted and given a first and prior lien upon the said wells, No. 5 and No. 6, until the said sum of thirty-two thousand ($32,000.00) dollars shall have been paid." Other provisions of the contract demonstrate lack of intention to give the contractor a lien upon the wells themselves for payment of the amount of the oil payment. The contract provides that the consideration of $32,000 is payable out of proceeds of $28\frac{5}{32}$ of the first oil and gas produced, saved and marketed from wells Nos. 5 and 6, that the lessee shall not be personally liable for the consideration, and that the consideration "shall never be paid out of any oil and gas but that produced from the above described wells, No. 5 and No. 6." These provisions of the contract make it clear that the security was confined to the production of wells Nos. 5 and 6, and did not cover any other property. A lien upon production alone does not make the proceeds therefrom taxable to the lessee. *Anderson* v. *Helvering*, *supra.*

What has been said respecting the contents of the drilling contract partially answers the second point raised by the respondent. Other provisions of the contract are that for measuring the production of wells Nos. 5 and 6, and therefore the extent of the contractor's right to participate in the proceeds of each run of oil, the wells shall be deemed to produce their proportionate share of all of the six wells on the lease. This was nothing more than a means agreed upon in advance to gauge the quantity of oil produced by the wells to which the contractor was required to look for recovery of his investment. In other words, it was a mere substitute for actual production of wells Nos. 5 and 6 and in nowise alters the fact that the oil payment was payable out of production and from no other source. Accordingly, the case of *Thomas* v. *Perkins*, *supra*, applies and it follows that the sum of $2,105.40 in question does not constitute taxable income of E. C. Laster, Inc.

## *Issue VII.*

Petitioner E. C. Laster owned all of the stock of E. C. Laster, Inc., and the Retsal Drilling Co. The latter acquired the working interest in two leases, part of the production of which was subject to oil payments held by E. C. Laster, Inc. The interest of the Retsal Drilling Co. in the leases was increased in 1936 by the transfer to it without consideration of oil payments held by E. C. Laster, Inc. Petitioner E. C. Laster testified that "We just demolished the oil payment in favor of the Retsal Drilling Company." The

respondent placed an aggregate fair market value of $6,243.78 on the oil payments and included the amount in gross income of E. C. Laster, Inc., citing section 45 of the Revenue Act of 1936 as his authority. The petitioner admits that the oil payments were assigned without consideration and does not question the valuations determined by the respondent.

Section 45 authorizes the Commissioner in any case where, as here, two businesses are owned by one individual, "to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

Petitioner upon brief contends that the respondent's action was not an allocation of gross income to prevent evasion of taxes or necessary to clearly reflect income, but created income where none existed.

The respondent does not contend that the application of section 45 is necesary in order to prevent evasion of taxes. He does argue that he exercised the right conferred upon him by the provision in order to clearly reflect the income of each corporation. The effect of his argument seems to be that the transferee realized taxable income upon the receipt of the oil payments equal to the increase in value of its assets because of their "cancellation" and that the amount thereof should be allocated to the transferor on account of its failure to obtain full consideration for the oil payments.

An acquisition of property without or for less than an adequate consideration does not ordinarily result in taxable income. The respondent cites *Walker* v. *Commissioner*, 88 Fed. (2d) 170, and *B. F. Avery & Sons, Inc.*, 26 B. T. A. 1393, on the point. Those cases involved the question of whether forgiveness of indebtedness results in the receipt of taxable income. Here, the transfers increased the value of the assets of the transferee, whether it canceled the oil payments upon their receipt or kept them alive for probable sale. Not having paid any consideration for the additional interest in production, it had no basis in the oil payments, and if it sold them, the whole of the selling price would represent taxable gain. They were income-producing assets in the hands of the transferor, not liabilities such as accounts or notes payable, and any income received by the transferee under the oil payments would be taxable to it.

The situation is similar to the one before the court in *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 Fed. (2d) 508. There the same interests owned the stock of two corporations which agreed that certain equipment owned by one of them could be used by the

other in 1934 without charge. The Commissioner determined a rental of $12,000 for the year and included the amount in gross income of the owner as a proper allocation of income under section 45. The court, in deciding that the petitioner realized no taxable income in the transaction, said: "Section 45, supra, did not authorize the Commissioner to set up income where none existed. The principal purpose of the section was to clearly reflect income that did exist."

The acquisition by the Retsal Drilling Co. of the oil payments without cost did not result in income to it or the transferor. It follows therefrom that there was no income to distribute or allocate under section 45. On this issue our holding is for the petitioner.

## *Issue VIII.*

The disallowance by the respondent of a deduction of $4,200 taken by E. C. Laster, Inc., in 1936 as ordinary and necessary business expenses for legal fees was upon the ground that the amount was accrued for legal work performed in connection with the dissolution of the corporation and the creation of two trusts by E. C. Laster, the sole stockholder of the corporation.

It is established by the record that the law firm was retained for a monthly fee of $350 to perform general legal services for the corporation and its fee of $4,200 for 1936 was paid in 1937. It is well settled that legal fees properly accrued by corporations for general legal services and for services rendered in connection with dissolution proceedings are deductible as ordinary and necessary business expenses. *Saks & Co.*, 20 B. T. A. 1151; *Pacific Coast Biscuit Co.*, 32 B. T. A. 39. The evidence also establishes that no part of the fee in controversy was paid for services performed by the firm in connection with the creation of the trusts by E. C. Laster for the benefit of his children. E. C. Laster consulted the senior member of the firm about the matter and the firm drafted the instruments. The fee of the firm and Harry C. Weeks for their services was included in one bill rendered to E. C. Laster by the latter and when the fee was paid the senior member of the firm declined to accept the firm's share thereof.

It is apparent from the facts before us that no part of the item of $4,200 was accrued by E. C. Laster, Inc., for legal services rendered by the law firm to the corporation's sole stockholder in connection with the formation of the two trusts. For this service a separate charge was made and presumably paid by E. C. Laster. The entire amount of the item is deductible as an ordinary and necessary business expense of E. C. Laster, Inc., and we so hold.

*Decision will be entered under Rule 50.*