V & M Homes, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 61357.   Filed August 30, 1957.

*Harry W. Wellford, Esq.*, and *W. Stuart McCloy, Esq.*, for the petitioner.

*Raymond Whiteaker, Esq.*, for the respondent.

Bruce, *Judge:* The respondent determined deficiencies in the income tax of the petitioner as follows:

| Fiscal year ended November 30 | Deficiency |
| --- | --- |
| 1951 | $6, 878. 79 |
| 1952 | 2, 283. 89 |

The only question for decision is whether the petitioner sustained an allowable loss for the fiscal year ended November 30, 1952.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as facts and incorporated herein by this reference.   The petitioner, V & M Homes, Inc., was incorporated on December 10, 1949, under the laws of the State of Tennessee, for the purpose of engaging in construction work. It filed its income tax returns on a fiscal year basis ending November 30.   Petitioner filed its income tax returns for the fiscal years ended in 1951 and 1952 with the collector of internal revenue for the district of Tennessee.

Fifty per cent of the stock of petitioner was owned by H. F. Van Nieuwenhuyze (hereinafter referred to as Vann) and 50 per cent was owned by W. W. Mink.   Cherry Gardens Apartments, Inc. (hereinafter referred to as Cherry Gardens), was incorporated on Novem-

ber 23, 1951, under the laws of the State of Tennessee, and Vann and Mink owned the stock of that corporation (when incorporated) equally. During the years in issue Vann and Mink were also equal partners in the business known as Superior Construction Company (hereinafter referred to as Superior).

Prior to the period in issue Mink and Vann had been engaged in the construction business in Memphis, Tennessee. As equal partners in H. F. Vann & Sons they constructed commercial-type buildings, schools, and churches, on which they utilized union labor. As V & M Homes, Inc., they developed real estate and built residences for sale. The construction of the residences was contracted by petitioner, which in turn subcontracted the actual construction to Superior inasmuch as the latter employed nonunion labor and consequently had lower labor costs.

In 1951 a permit was obtained from the Zoning and Planning Commission to build a 50-unit apartment project on an approximately 7-acre tract of land in Memphis owned by petitioner. Plans for the apartment project, dated September 25, 1951, were drawn up by an architect. Cherry Gardens was organized for the purpose of building and operating such apartments. An estimate of the cost of the project was prepared by Mink, which included the following summarized amounts:[1]

| | |
|---|---|
| Cost of buildings | $265,285 |
| Architect's fee | 2,500 |
| Landscape | 2,500 |
| Land | 10,000 |
| Service charge | 10,000 |
| Service drives | 4,300 |
| Curb | 4,000 |
| Sidewalk | 2,000 |
| Total | 300,585 |

Labor and materials were presumably included in the "Cost of buildings" item. The land had a cost basis of $6,472.16. Mink estimated the cost to petitioner (apparently exclusive of any profit on the land and of any service charge) as $287,057.16.

On November 27, 1951, the petitioner entered into an agreement with Cherry Gardens to furnish the necessary land and construct the 50-unit apartment project for a contract price of $300,000. On November 29, 1951, petitioner entered into a subcontract with Superior whereby Superior agreed to do the construction work in accordance with the plans and specifications described in the contract between petitioner and Cherry Gardens, for $300,000. No bids were received before letting the contract for such construction and no performance bonds or completion insurance was required from any of the parties.

---

[1] The written estimate itself was not offered in evidence.

To finance the project a $260,000 construction loan was obtained by Cherry Gardens from Marx & Bensdorf, Inc., a real estate mortgage loan and insurance business located in Memphis, Tennessee. As security for such loan Cherry Gardens gave a first mortgage and a note personally endorsed by Mink and Vann. An additional loan of $61,299.50 was later obtained by Cherry Gardens from Marx & Bensdorf. $300,000 of such loans was used to pay petitioner its contract price and the remaining $21,299.50 to pay brokerage fees, insurance, interest, taxes, and other charges upon final settlement.

Construction on the apartment project commenced about November 1951, and by May 1952 it became apparent that construction costs were going to exceed the amounts estimated by Mink. Mink and Vann attempted to get some other concern to take over the construction of the project but were unable to do so. Superior did not have sufficient funds to complete construction. Additional funds were finally furnished by petitioner, which, with Superior furnishing the labor, then completed the project. In 1953, Mink and Vann transferred 60 per cent of their interest in Cherry Gardens to certain parties who had advanced funds with which to complete the Cherry Gardens Apartments as well as the completion of a military housing project in Alabama (Redstone Arsenal Homes, Inc.) which petitioner had contracted to build in March 1952, but was unable to complete.

Petitioner expended a total of $360,360.56 on the Cherry Gardens apartment project. This sum includes the cost of the land and a $9,103.42 profit paid by petitioner to Superior. Petitioner received in reimbursement from Cherry Gardens the contracted amount of $300,000. Petitioner claimed a loss on the Cherry Gardens project for the fiscal year ended November 30, 1952, in the amount of $60,360.56 and as a result on its income tax return for that year reported a net operating loss of $52,747.59. Petitioner filed with this return an application for a tentative carryback adjustment to the fiscal year ending in 1951 and a refund for such year in the amount of $6,878.79 was allowed. Subsequently respondent determined that the $60,360.56 claimed by petitioner was not allowable and that in order that its income should be correctly reflected such amount should be added to the cost basis of Cherry Gardens.

No action was ever brought by petitioner against Superior for reimbursement of the amounts expended by petitioner as a result of Superior's default on its contract.

Cherry Gardens, Superior, and petitioner each had the same officers and were controlled by the same interests. Each business had separate books and accounts.

Petitioner did not anticipate any profit on its contract to construct the Cherry Gardens apartments.

The contracts between petitioner, Cherry Gardens, and Superior were not arm's-length transactions and an allocation of the entire cost of construction to the cost basis of the Cherry Gardens apartments is necessary to correctly reflect the income of the related organizations.

OPINION.

This case involves the respondent's disallowance of a loss claimed by petitioner and his concurrent determination that the amount of such claimed loss should be allocated to the capital structure of Cherry Gardens, another corporation controlled by the same persons as those who controlled petitioner. The respondent in the notice of deficiency determined that "the loss, if any, is not an allowable deduction and accordingly has been disallowed. Section 29.23 (f)–1, Regulations 111. It has also been determined that the allowance of the deduction is prohibited by Sections 23 (a) and 45 of the Internal Revenue Code of 1939."

It is recognized that ordinarily expenses incurred by a contractor in fulfilling the obligations of a defaulting subcontractor are deductible as ordinary and necessary business expenses within the meaning of section 23 (a),[2] or as a loss under section 23 (f)[3] of the Internal Revenue Code of 1939. See *Commissioner* v. *John Thatcher & Son*, 76 F. 2d 900, reversing on other grounds 30 B. T. A. 510.[4] Respondent does not argue otherwise, but contends that petitioner did not maintain an arm's-length relationship in its dealings with its related organizations, Cherry Gardens and Superior, all of which were owned and controlled by Mink and Vann, and therefore the loss should not be allowed.

It is well settled that the burden of proof is upon the taxpayer to establish a deductible loss. *Burnet* v. *Houston*, 283 U. S. 223; *New Colonial Co.* v. *Helvering*, 292 U. S. 435. We agree with respondent that petitioner has failed to do so in the instant case.

Petitioner is seeking a deduction for an alleged loss which ordinarily would not have occurred had contracts for the construction of the

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

  (a) EXPENSES.—

    (1) TRADE OR BUSINESS EXPENSES.—

      (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

  *      *      *      *      *      *      *

  (f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

[4] It is pertinent to point out, however, that to the extent such claimed expenses include a profit paid to the defaulting subcontractor they do not constitute ordinary and necessary business expenses and accordingly, even if the transactions involved were at arm's length between uncontrolled parties, the $9,103.42 profit paid to Superior by petitioner would not be deductible under either section 23 (a) or (f).

Cherry Gardens apartments been arrived at in arm's-length negotiations between unrelated organizations. Mink and Vann, who owned and controlled petitioner, had been in the business of developing real estate and building residences for sale, deriving substantial income from profit on the land and from the construction work. Apparently, instead of developing and selling, they decided to build and operate a group of apartments on a 7-acre tract of land which was owned by petitioner. In order to do so they organized Cherry Gardens Apartments, Inc., to own and operate the apartments. An estimate of the cost of the project was prepared by Mink which, stripped of any profit on the land and of any charges for servicing the construction contract, amounted to $287,057.16. Including such profit and charges, however, Mink's estate amounted to $300,585. A contract was entered into between petitioner and Cherry Gardens whereby petitioner agreed to furnish the land and construct the apartments for a total contract price of $300,000. Petitioner thereupon subcontracted the actual construction work to Superior, a partnership comprised of Mink and Vann, for a contract price of $300,000. Mink testified petitioner did not expect to make a profit on the contract to construct the Cherry Gardens Apartments. Since it would have to furnish the land in addition to paying Superior $300,000 for the construction work, it is apparent it stood to lose at least $6,472.16, its cost basis in the land, not to mention any overhead or other expenses incurred in servicing the contracts. As it turned out, Mink's estimates were inadequate and the total cost of constructing the Cherry Gardens Apartments was $60,360.56 (including the cost of the land and a $9,103.42 profit paid to Superior) in excess of the contract price.

We think it obvious that neither contract was such a contract as would have been entered into in arm's-length negotiations between unrelated organizations. Here all three organizations, petitioner, Cherry Gardens, and Superior, were owned equally and controlled by Mink and Vann. Further evidence of the absence of an arm's-length relationship is to be found in the fact that no bids were sought or received before the execution of either contract and that no performance bonds or completion insurance was required from any of the parties. Moreover, in order to secure funds with which to finance its contract Mink and Vann personally endorsed the mortgage notes given by Cherry Gardens.

The situation here is comparable to that which existed in *Jesse Johnson*, 24 T. C. 107, affd. 233 F. 2d 752. There a building contractor incurred construction costs in excess of the contract price under contracts entered into with his wholly owned corporations to construct their housing projects. Though the contracts were amended during and after construction to provide increases in the amounts payable to the contractor, his total construction costs were in excess

of the amounts provided by the amended contracts. The petitioner therein sought to deduct the excess costs as losses under section 23 (e) of the Internal Revenue Code of 1939. This Court held that there was no arm's-length relationship between the petitioner therein and his wholly owned corporations, and the losses purportedly sustained by him under contracts with such corporations were nondeductible as losses but were contributions to the capital of the corporations.

The fact that the petitioner therein was an individual and the corporations involved were wholly owned by him, whereas here petitioner and Cherry Gardens are separate corporate entities organized for business purposes is immaterial to the question presently before us. Here petitioner, Cherry Gardens, and Superior (which Vann referred to as a mere "dummy") were all equally owned and controlled by Mink and Vann. Had they chosen to do so, a profit to petitioner not being a motive, they undoubtedly could have had petitioner contract to construct the apartments for cost or, when it developed that the construction costs were in excess of the original contract price, they could have amended the contract. See *Jesse Johnson, supra.* Their failure to do either can only be interpreted as an intention to evade taxes. Certainly, considering the common ownership and control, they should not be permitted, as Cherry Gardens, to obtain property worth more than the amount it had paid for it and at the same time, as petitioner, to obtain a tax deduction in the amount of the difference. See also *Crown Cork International Corporation*, 4 T. C. 19, affd. 149 F. 2d 968.

In our opinion petitioner is not entitled to a deduction for the amount of the purported losses either as ordinary and necessary business expenses under section 23 (a) or as losses under section 23 (f), but such losses should be allocated to the cost basis of the Cherry Gardens Apartments.

It appears from the statement attached to the notice of deficiency, as well as the opening remarks of counsel at the trial and on brief, that respondent does not propose to deny petitioner or its owners the benefit of funds expended in the construction of the Cherry Gardens Apartments, but merely to allocate the purported loss under section 45 of the Internal Revenue Code of 1939, so as to clearly reflect income.

Section 45 has been a part of the revenue laws since 1925.[5] See *Asiatic Petroleum Co., Ltd.* v. *Commissioner*, 79 F. 2d 234, 236, affirm-

---

[5] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

ing 31 B. T. A. 1152, certiorari denied 296 U. S. 645; *Seminole Flavor Co.*, 4 T. C. 1215. It grants to the Commissioner broad powers to allocate "gross income, deductions, credits, or allowances" if he determines that such allocation is necessary to prevent evasion of taxes or clearly to reflect the income of organizations owned or controlled by the same interests. Section 29.45–1 (*b*), Regulations 111, states:

> The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

The Commissioner's authority under section 45 is described in section 29.45–1 (*c*), Regulations 111, as follows:

> (*c*) *Application.* Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true net income of a controlled taxpayer, the Commissioner is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true net income extends to any case in which either by inadvertence or design the taxable net income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

It is well settled that if the Commissioner determines that an allocation is necessary the taxpayer has the burden of proving that the Commissioner's determination is unreasonable and that its situation is not one to which the statute applies. *Seminole Flavor Co., supra; Grenada Industries, Inc.*, 17 T. C. 231, aff'd. 202 F. 2d 873, certiorari denied 346 U. S. 819.

The situation presented in the instant case is clearly one to which section 45 was intended to apply and petitioner has not established that the Commissioner's determination is unreasonable. Petitioner, Cherry Gardens, and Superior were admittedly owned equally and controlled by Mink and Vann and the contracts involved are clearly not such as would have been entered into in arm's-length negotiations between uncontrolled taxpayers. Moreover, no real economic loss occurred in these transactions. Cherry Gardens obtained an apartment development worth in excess of $300,000, the total cost of which may be recovered through depreciation or the deduction of basis if the property is sold.

Considering all of the facts and circumstances, we hold that petitioner did not sustain an allowable loss for the fiscal year ended November 30, 1952.

*Decision will be entered for the respondent.*