HUBER HOMES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4765–68. Filed January 6, 1971.

---

*George G. Grubb* and *David W. Matthews*, for the petitioner.
*Robert A. Roberts*, for the respondent.

The Commissioner determined deficiencies in the income tax of petitioner for the taxable year ended March 31, 1963, and the taxable period beginning March 29, 1965, and ending August 31, 1965, in the respective amounts of $25,973.15 and $79,311.41.

After concessions by both parties, the issue presented is whether the Commissioner properly "allocated" income to the petitioner, under the terms of section 482, I.R.C. 1954, in respect of its transfer of 52 houses to its wholly owned subsidiary at cost.

FINDINGS OF FACT

The facts stipulated by the parties are incorporated herein by this reference.

Huber Homes, Inc. (sometimes referred to as Huber Homes or petitioner), is an Ohio corporation, formed on April 28, 1958. It filed a U.S. Corporation Income Tax Return for its taxable year ended March 31, 1963, and the taxable period ended August 31, 1965, with the district director of internal revenue, Cincinnati, Ohio. At the time it filed its petition herein Huber Homes maintained its principal place of business at Dayton, Ohio.

From its incorporation through August 31, 1965, Charles H. Huber (Huber) owned all of the outstanding stock of petitioner. He was also chairman of its board of directors and its chief executive officer at all times involved herein. It was the successor to a Huber family enterprise that was concerned with the construction and sale of houses.

During the period from April 28, 1958, through August 31, 1965, petitioner was engaged principally in the construction and sale of single-family houses in developments. These developments were lo-

cated in the metropolitan areas of Dayton, Ohio, Cincinnati, Ohio, Columbus, Ohio, and Fort Lauderdale, Fla.

Huber Heights, located a few miles outside of Dayton, Ohio, is one of the developments. At the time of the formation of Huber Homes, approximately 700 houses had already been completed in Huber Heights. Huber Homes built approximately 3,700 more houses in that area during the period from April 28, 1958, through August 31, 1965, of which approximately 3,300 were sold to the general public. The remaining houses built during that period, about 400 in number, were acquired by Huber Investment Corp., hereinafter described.

Huber Investment Corp. (Huber Investment) is an Ohio corporation, organized on April 10, 1959. From the date of incorporation through August 31, 1965, all of its outstanding stock was owned by petitioner. At all times involved herein Huber was the chairman of its board of directors and its chief executive officer.

Huber Investment was formed for the purpose of acquiring and holding property not directly connected with petitioner's business of building and selling single-family houses. From its incorporation until August 31, 1965, Huber Investment was engaged principally in the real estate rental business. It owned approximately 400 rental houses in Huber Heights, approximately 100 houses in Indianapolis, Ind., and an unspecified number of houses in Columbus, Ohio, Cincinnati, Ohio, and Fort Lauderdale, Fla. The majority of the houses owned by Huber Investment on August 31, 1965, were acquired from petitioner. Huber Investment itself never built any houses.

After forming Huber Investment, with only comparatively minor exceptions, petitioner did not own, manage, or maintain any rental houses in Huber Heights. From its incorporation through the year in issue, Huber Investment sold only one of its Huber Heights homes, a single-family residence which was first rented to petitioner for use as an office and later sold to a realtor.

Petitioner and Huber Investment were operated as two separate and autonomous companies, and the books, records, and bank accounts of each were separately maintained. Each company had its own payroll and its own employees. Huber Investment's employees performed all the activities of a landlord with respect to the houses which it owned. Petitioner's employees never performed any of such activities with respect to Huber Investment's properties.

Petitioner developed the land in Huber Heights in sections, ranging in size from approximately 50 to 200 houses. As soon as a new section was opened for development, petitioner's sales department was permitted to sell the houses which were to be built there through the use of furnished and landscaped model homes. On the average, approximately 70 percent of the houses in a section were sold by the time all the houses

in that section had been completed. In the late summer and fall of each year, however, petitioner would begin construction of houses beyond its immediate needs and in anticipation of sales during the following winter and spring, since it found it impractical to start construction between the beginning of November and the middle of the following April.

Based upon previous sales and upon the then current market conditions, Charles Huber, plus the sales manager, production manager, and other officers of petitioner determined, at a meeting held sometime in August, 1964, that 148 houses could be built and sold in Huber Heights from the fall of 1964 through the spring of 1965 when construction could start again. Thus, petitioner started construction on 148 houses in the late summer and early fall of 1964.

The prices at which the foregoing 148 houses and lots were offered to the public were set by petitioner on the basis of direct labor and material costs, land and land development costs, overhead, and profit. The base prices at which the houses were offered to the public varied according to the model of the particular house, ranging from $12,995 to $19,995. After the prices were established, they were made known to the public by advertising, through brochures, and in the sales office. It was petitioner's established policy never to offer any house to the public at a price below its published price.

During the period from the commencement of construction of the 148 aforementioned houses through the period in question, ending August 31, 1965, petitioner employed four full-time salesmen, working 7 days a week, to solicit the sales of these houses. The salesmen were instructed to sell every house they could, and they were compensated on a salary plus commission basis.

Of the 148 houses started in the late summer and early fall of 1964, petitioner succeeded in selling only 95 to the public. Four more houses were acquired by Huber Investment during its taxable year ended March 28, 1965. Despite petitioner's sales effort from the fall of 1964 until the early summer of 1965, the 49 houses which remained out of the original 148 could not be sold at the prices asked due to the then existing market conditions. Three other houses, constructed by petitioner at other times, were also unsold as of the early summer of 1965; one was a new style, model Q, which had been built as a model home, and two were houses started prior to the construction of the aforementioned 148 houses. Thus, a total of 52 houses were unsold as of this time.

Petitioner transferred 38 of the 52 unsold houses and lots to Huber Investment by journal entry on July 1, 1965, approximately 8½ to 9½ months after construction on the 38 houses had begun, and approxi-

mately 2½ to 6 months after the 38 houses had been finished. It transferred another 13 of the 52 houses and lots to Huber Investment by journal entry on August 1, 1965, approximately 9½ to 10½ months after construction on the 13 houses had begun, and approximately 3½ to 7 months after the 13 houses had been finished. Finally, it transferred the model Q house and lot to Huber Investment by journal entry on August 31, 1965.

Title to the 52 houses and lots was formally transferred by petitioner to Huber Investment by deeds during August 1965.

Huber Investment acquired the aforementioned 52 houses at petitioner's actual cost of $723,003.25. On petitioner's books and records there was an "Account Receivable" from its subsidiary, Huber Investment, and the debt on that intercompany open account was increased in the aggregate amount of $723,003.25 to reflect the transfer of the 52 houses at cost. During the taxable period ending August 31, 1965, the monthly balance of petitioner's "Account Receivable" from Huber Investment, as reflected on petitioner's books and records, was as follows:

| | | | |
|---|---|---|---|
| Mar. 31, 1965 | $546,301.42 | June 30, 1965 | $544,248.13 |
| Apr. 30, 1965 | 546,301.42 | July 31, 1965 | 1,067,411.96 |
| May 31, 1965 | 544,248.13 | Aug. 31, 1965 | 465,342.84 |

The aggregate sales price to the general public of the 52 houses was $907,807.28.

The 52 houses were transferred to Huber Investment in order that they be converted to rental properties. The decision to do so was based on the belief that the houses could not be sold to the public at the published selling prices, and that by continuing to hold the unsold houses, petitioner not only would incur interest charges and other expenses but would also sustain losses arising from vandalism and deterioration.

After their transfer, Huber Investment, with a view towards renting the houses, obtained insurance on all the 52 houses in issue, and, in addition, installed venetian blinds and curtain and drapery rods in all 52 houses except the model Q house, and installed stair carpeting in the 8 two-story houses that were included within the 52 houses.

The 52 houses have been rental units ever since their acquisition by Huber Investment. The rentals which it charged were usually set by model, depending upon the size of the model, with certain adjustments for "extras" such as a two-car garage, fireplace, custom kitchen, etc. The rental prices of the houses ranged from $105 to $180 per month.

In July and September 1965, the vice president in charge of the Appraisal Department of Citizens Federal Savings & Loan Association, Dayton, Ohio, Thomas J. Gilfoil, appraised each of the 52 houses

and lots in issue in connection with applications for mortgage loans made by Huber Investment. He appraised the aggregate fair market value of the individual houses and lots in issue to be $852,045 as of that time. Because 38 houses and lots were transferred to Huber Investment on July 1, 1965, in a bulk transaction, and on August 1, 1965, 13 more houses and lots were also transferred in a bulk transaction, the fair market value of these houses and lots as a group was 5 percent less than the total of the fair market value of each individual house and lot.

During the summer of 1965, there was a resale market for houses in Huber Heights built by Huber Homes. The prices for such houses were generally lower than the prices of comparable new houses offered for sale by Huber Homes. During its taxable year ended August 31, 1966, Huber Homes sold 132 houses in Huber Heights to the general public. The model types of these houses were generally the same as those sold in previous years.

In its return for the taxable period ended August 31, 1965, Huber Homes reported a net loss of $61,882.13. This amount was carried back to its fiscal year ended March 31, 1963.

On its return for the taxable period ended August 31, 1965, Huber Investment reported gross rental income of $470,181.09 and a net loss in the amount of $56,517.99.

From the date of its incorporation through the taxable period ended August 31, 1965, Huber Investment has computed its depreciation deduction on buildings on the double-declining-balance method using a 30-year life for all single-family residences.

The Commissioner determined deficiencies in the income tax of Huber Homes for its taxable year ending March 31, 1963, and the taxable period ending August 31, 1965. In his notice of deficiency he stated:

a) It is determined that during the taxable year ended August 31, 1965 you had a profit of $205,113.85 upon transfer of houses to your wholly owned subsidiary, Huber Investment Corp. The profit is allocated to you under the provisions of section 482 of the Internal Revenue Code since it is determined that this allocation is necessary in order to prevent evasion of taxes and to clearly reflect income. Therefore, taxable income is increased $205,113.85 as shown below.

| | |
|---|---|
| Cost of houses transferred | $723,003.25 |
| Estimated sales prices | 928,117.10 |
| Profit | 205,113.85 |

This determination resulted not only in a deficiency for the taxable period ending August 31, 1965, but also a deficiency for the taxable year ending March 31, 1963, by reason of the elimination of the reported

net loss for the period ending August 31, 1965, which in turn eliminated the net operating loss carryback to the year ending March 31, 1963.

The report of the Internal Revenue Service agent in respect of an audit of Huber Investment's books and records and its tax return for the taxble period beginning March 29, 1965, and ending August 31, 1965, stated, in part:

The income of one member of a controlled group was increased by $205,113.85 * * *. The correlative adjustment to this member of the controlled group resulted in the basis of real estate being increased by $205,113.85 * * *.

The $205,113.85 was allocated between land and buildings as follows:

land                 $39,931.00          buildings                  $165,182.85.

### OPINION

RAUM, *Judge*: During 1965 petitioner transferred, at its actual cost, 52 newly constructed houses to its wholly owned subsidiary, Huber Investment, which then rented the houses to the public. It is conceded by petitioner that at the time of the transfer the houses had a fair market value in excess of cost—though the exact amount thereof is in dispute herein. The Commissioner has determined that, pursuant to section 482, I.R.C. 1954, income should be "allocated" to petitioner to the extent of the difference between the cost of the houses and their fair market value at the time of transfer. The petitioner argues that this determination is unreasonable and arbitrary because no income was realized in respect of the transfer.

Section 482 provides:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAX-PAYERS

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The purposes of section 482, and the Commissioner's authority thereunder, were set out in *Pauline W. Ach*, 42 T.C. 114, 125–126, affirmed 358 F. 2d 342 (C.A. 6), certiorari denied 385 U.S. 899:

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. *Ballentine Motor Co., Inc.*, 39 T.C. 348, affirmed 321

F. 2d 796 (C.A. 4) ; *Seminole Flavor Co.*, 4 T.C. 1215, 1228. The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. See, e.g., *G.U.R. Co.* v. *Commissioner*, 117 F. 2d 187, 189 (C.A. 7) ; *National Securities Corp.*, 46 B.T.A. 562, 564, affirmed 137 F. 2d 600, 602 (C.A. 3), certiorari denied 320 U.S. 794 ; *Grenada Industries, Inc.*, 17 T.C. 231, 255, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. * * *

See also *Hamburgers York Road, Inc.*, 41 T.C. 821, 833, acq. 1965–2 C.B. 5; *Philipp Bros. Chemicals, Inc.*, 52 T.C. 240, 251, affirmed 435 F. 2d 53 (C.A. 2); *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073, 1093, on appeal (C.A. 7); H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17 (1927), reprinted in 1939–1 C.B. (Part 2) 395; S. Rept. No. 960, 70th Cong., 1st Sess., p. 24 (1928), reprinted in 1939–1 C.B. (Part 2) 426.

In order to prevent the artificial shifting of income from one related business to another, section 482 places a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer. See, e.g., *Asiatic Petroleum Co.* v. *Commissioner*, 79 F. 2d 234, 236 (C.A. 2), affirming 31 B.T.A. 1152, certiorari denied 296 U.S. 645, rehearing denied 296 U.S. 664; *Simon J. Murphy Co.* v. *Commissioner*, 231 F. 2d 639, 643 (C.A. 6), reversing 22 T.C. 1341; *Oil Base, Inc.* v. *Commissioner*, 362 F. 2d 212, 214 (C.A. 9), certiorari denied 385 U.S. 928; *Baldwin-Lima-Hamilton Corp.* v. *United States*, 435 F. 2d 185 (C.A. 7) ; Income Tax Regs., secs. 1.482–1(b) and 1.482–1(c). Thus, income which has been artificially diverted to one member of a controlled group but which in fact was earned by another member of the group may be "allocated" by the Commissioner under section 482 of the entity which really earned it. However, in the present case Huber Investment has not received any income—indeed, it has sustained losses—which was earned by petitioner and should be "allocated" to it. Nevertheless, the Commissioner seeks to apply section 482, relying upon regulations section 1.482–1 (a) (6), which states:

Sec. 1.482–1. Allocation of income and deductions among taxpayers.—(a) *Definitions.* * * *

* * * * * * *

(6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, the credits, the allowances, or the item or element of income, deductions, credits,

or allowances, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).

The Commissioner argues that had the transaction between petitioner and its subsidiary been at arm's length, additional income would have inured to petitioner in the amount of the excess of the fair market value of the houses transferred over petitioner's cost. And, if Huber Investment had dealt with its parent at arm's length it would have paid the fair market value of the houses. Hence, contends the Commissioner, in order "clearly to reflect the income"[1] of both corporations, petitioner's income should be increased by what it would have earned in an arm's-length sale and Huber Investment's basis in the houses should be increased accordingly. This approach finds at least some support in the regulations, sections 1.482–1(a)(6), 1.482–1(d)(1), and 1(d)(4),[2] particularly the latter.

The arm's-length standard relied upon by the Commissioner has traditionally been upheld where it has served as the basis for a reallocation of income derived from dealings with third parties—i.e., parties other than the controlled corporations which have engaged in transactions at less than arm's length. For example, in *Oil Base, Inc.* v. *Commissioner*, 362 F. 2d 212 (C.A. 9), the parent corporation granted

---

[1] The Commissioner does not argue that his determination is necessary "to prevent evasion of taxes."

[2] Sec. 1.482–1. Allocation of income and deductions among taxpayers.—* * *

(d) *Method of allocation.* (1) The method of allocating, apportioning, or distributing income, deductions, credits, and allowances to be used by the district director in any case, including the form of the adjustments and the character and source of amounts allocated, shall be determined with reference to the substance of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income. The appropriate adjustments may take the form of an increase or decrease in gross income, increase or decrease in deductions (including depreciation), increase or decrease in basis of assets (including inventory), or any other adjustment which may be appropriate under the circumstances. See § 1.482–2 for specific rules relating to methods of allocation in the case of several types of business transactions.

\* \* \* \* \* \* \*

(4) If the members of a group of controlled taxpayers engage in transactions with one another, the district director may distribute, apportion, or allocate income, deductions, credits, or allowances to reflect the true taxable income of the individual members under the standards set forth in this section and in § 1.482–2 notwithstanding the fact that the ultimate income anticipated from a series of transactions may not be realized or is realized during a later period. For example, if one member of a controlled group sells a product at less than an arm's length price to a second member of the group in one taxable year and the second member resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, notwithstanding that the second member of the group had not realized any gross income from the resale of the product in the first year. Similarly, if one member of a group lends money to a second member of the group in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second member does not realize income during such year. The provisions of this subparagraph apply even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.

its wholly owned subsidiary commissions and discounts twice as large as those allowed uncontrolled sales representatives. The Commissioner allocated portions of the subsidiary's sales income to the parent on the basis of what would have been the parent's arm's-length arrangements with uncontrolled parties. The Commissioner's determination was approved. Likewise, in *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990 (Ct. Cl.), the Commissioner successfully charged the parent manufacturing company with portions of the profits received on sales to outsiders by its wholly owned subsidiary where the parent's sales to the subsidiary were at less than arm's-length prices. In these cases, as in the other cases relied upon by the Commissioner, e.g., *Dillard-Waltermire, Inc.* v. *Campbell*, 255 F. 2d 433 (C.A. 5); *Grenada Industries, Inc.*, 17 T.C. 231, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819, the determinations in issue were based on the *reallocation* of income derived from dealings with third parties. And the arm's-length formula simply played a part in determining what portion of the income received by a member of the controlled group was really earned by and therefore properly allocable to another member of the group. However, we are not faced with that situation here. Huber Investment did not resell the houses transferred to it, and thereby receive a profit that was in fact attributable to petitioner but which was artificially channeled to Huber Investment by means of an intercompany sale at cost. Moreover, in contrast to his position in the foregoing cases, the Commissioner does not here contend that any of Huber Investment's gross rental income was not earned by it or that any portion of *its* income should be allocated to Huber Homes. Rather, the Commissioner is purporting to exercise his authority under section 482 to create income, i.e., to charge petitioner with the income it would have realized had its sale to Huber Investment been at arm's length. We hold that this determination is not authorized by section 482.

Essential to the application of section 482 is the distribution, apportionment, or allocation of income realized at some time by the controlled group. This was made clear in *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 F. 2d 508 (C.A. 6), reversing a Memorandum Opinion of this Court. In that case, the taxpayer made available certain movable equipment to an affiliate, "Mississippi." During the year in issue no rental charge was made for the use of the equipment and, pursuant to section 45 of the Revenue Act of 1934 (predecessor of section 482), the Commissioner determined that the taxpayer had rental income of $12,000, the value of the use of the equipment based on arrangements made the previous year. The Court of Appeals rejected the Commissioner's position, stating (112 F. 2d at 510):

Regardless of what he [the Commissioner] may have contemplated, the undisputed fact is, that he made no distribution, apportionment or allocation of gross

income between petitioner and Mississippi. He made no attempt to allocate any portion of the $51,427.70, representing the gross income of Mississippi in 1934, to petitioner. The record clearly discloses what he did. He simply concluded that petitioner should have charged Mississippi rent upon the equipment for the year 1934, notwithstanding the fact that petitioner neither charged, collected or could have collected rent under its agreement with Mississippi. Having so determined, the Commissioner fixed the rental to be charged at $1,000 per month based upon the rate charged by petitioner for a portion of 1933. Having so fixed the rental, he charged it to petitioner as income in the following language: "Add: . . . 2. Rent of equipment $12,000.00."

Section 45, supra, *did not authorize the Commissioner to set up income where none existed*. The principal purpose of the section was to clearly reflect income that did exist.

It is suggested that the law will imply that the Commissioner apportioned the $12,000 to petitioner from the gross income of Mississippi, but the law permits no inferences contrary to fact.

[Emphasis supplied.]

The present case closely parallels *Tennessee-Arkansas* in that the Commissioner here, as there, did not *allocate* to the taxpayer any of the gross income of the related party to which there was a transfer at less than arm's length. Instead, here, as there, the Commissioner *created* income out of a transaction which, in the Commissioner's opinion, only *would have* produced income had the petitioner dealt with the controlled party at arm's length. Thus, it is apparent that the Commissioner here did not "distribute, apportion, or allocate gross income" within the meaning of section 482. See 7 Mertens, Law of Federal Income Taxation, sec. 38.63, p. 176; *Simon J. Murphy Co.* v. *Commissioner*, 231 F. 2d at 644 (dictum).[3]

The Commissioner seeks to distinguish the *Tennessee-Arkansas* case on the ground that the decision was based on the Commissioner's failure to make a correlative adjustment to the income or deductions of the related entity. We think, however, that the Sixth Circuit's decision rests on a broader ground: that the allocation under section 482 must be of income actually realized by a member of the controlled group.

Nor do we think that the Commissioner's proposed adjustment to Huber Investment's basis in the houses transferred to it sufficiently effects an allocation of Huber Investment's income to petitioner. The fact remains that even in light of this adjustment income is being attributed to petitioner that was not in fact realized by the controlled group. Compare *V & M Homes, Inc.*, 28 T.C. 1121, affirmed 263 F. 2d 837 (C.A. 6). Had petitioner retained the 148 houses and rented them itself to tenants, it could not conceivably have been charged with income to the extent that the fair market value of the houses exceeded cost, and certainly its basis for depreciation would have been only

---

[3] Cf. *Southern College of Optometry, Inc.*, 6 T.C.M. 354, 357.

cost. Plainly, section 482 was not intended to produce a different result; it was designed merely to "unscramble" (*Grenada Industries, Inc.*, 17 T.C. at 253) a situation where income realized by the controlled group and earned by one member of the group is diverted to another group member by means of transactions not carried out at arm's length.

In *E. C. Laster*, 43 B.T.A. 159, acq. 1941–1 C.B. 7, modified on other grounds 128 F. 2d 4 (C.A. 5), the Board rejected the Commissioner's attempt to attribute income to a transferor of valuable oil-payment rights, without charge, to its wholly owned subsidiary, the owner of the working interest. There, as in the present case, income was not realized by the transferee of the rights during the taxable year. After citing the *Tennessee-Arkansas* case, the Board stated, at page 177:

> The acquisition by the Retsal Drilling Co. of the oil payments without cost did not result in income to it or the transferor. It follows therefrom that there was no income to distribute or allocate under section 45. * * *

In *Smith-Bridgman & Co.*, 16 T.C. 287, acq. 1951–1 C.B. 3,[4] the petitioner, a wholly owned subsidiary of Continental, made interest-free loans to its parent. The Commissioner included in the taxpayer's gross income an amount representing a 4-percent interest charge in respect of its loan to its parent. The Court disapproved the Commissioner's determination (16 T.C. at 293):

> In support of his action the respondent argues that Continental, in securing these non-interest-bearing loans from petitioner, was enabled to relieve itself from paying interest on its outstanding debentures; and, furthermore, he argues, petitioner could have loaned the funds which Continental borrowed without interest to third parties at 4 per cent interest. Therefore, in order to prevent evasion of taxes and to clearly reflect the income of such related businesses, he has "allocated" to petitioner part of the income of its parent, in the exercise of the discretion conferred by section 45 of the code. The decisions involving section 45 make it clear that its principal purpose is to prevent the manipulation of or improper shifting of gross income and deductions between two or more organizations, trades, or businesses. Its application is predicated on the existence of income. The courts have consistently refused to interpret section 45 as authorizing the creation of income out of a transaction where no income was realized by any of the commonly controlled businesses. *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 Fed. (2d) 508; *E. C. Laster*, 43 B.T.A. 159, modified on other issues, 128 Fed. (2d) 4; *Epsen-Lithographers, Inc.* v. *O'Malley*, 67 Fed. Supp. 181, cf. *Hugh Smith, Inc.*, 8 T.C. 660, affd., 173 Fed. (2d) 224, certiorari denied, 337 U.S. 918.

The Court in *Smith-Bridgman* further noted that no correlative adjustment was made in the income of or deductions of Continental to account for the increase in the taxpayer's income. The Commissioner contends that this factor explains the decision and thereby

---

[4] The Commissioner's acquiescence is explained in Rev. Rul. 67–79, 1967–1 C.B. 117.

distinguishes it from the present case. We disagree. We view this factor as no more than a possible supporting ground for the decision and not the controlling reason. It is no different in this respect from the similar situation in *Tennessee-Arkansas*.

Finally, in *Texsun Supply Corp.*, 17 T.C. 433, acq. 1952–1 C.B. 4, Texsun's subsidiary sold boxes to it at its manufacturing cost, which Texsun, a cooperative supply corporation, then resold to its members. Texsun was required by its bylaws to sell to its members at cost, and it accomplished this by first selling to them at prevailing market prices and then rebating its "profits" to them at yearend. It thus realized no profit on such sales. The Commissioner attempted to "allocate" a profit to Texsun's subsidiary on the sales based on prevailing arm's-length prices. The Court, citing *Smith-Bridgman & Co.*, again refused to approve the allocation.

Against the foregoing background of decided cases favorable to the petitioner, the Commissioner argues that he would be foreclosed from correcting distortions in income where goods or services are transferred to a related party at less than arm's-length prices and the goods or services are consumed rather than sold by the transferee. But if, as a consequence of such use or consumption by the transferee, income is realized within the controlled group, an entirely different question would be presented as to whether such income or a portion thereof might be allocated to the transferor under section 482. That situation, however, is not before us.

In deciding that section 482 is inapplicable here we do not reach the question whether the regulations (fn. 2 *supra*) relied upon by the Commissioner are valid. They plainly contemplate a situation where one member of a controlled group sells to another at less than fair market value and where it is expected that the controlled vendee would in turn resell the product to a third party. In order properly to reflect income the profit on such resale would have to be fairly allocated between the two controlled corporations; the regulations provide that in such circumstances the allocation of its share of the profit to the original vendor need not await the year of ultimate sale but may be made immediately. We think that the regulations do not cover the present case where there was no intention to resell the 52 houses in issue, where they were converted to rental use, where they are still held for rental purposes, and where they do not appear to be productive of any net income whatever. In the circumstances we do not pass upon the validity of the regulations in situations where resale of the transferred property was contemplated regardless of when or even whether such resale in fact occurred.

The taxpayer has argued that the excess of the fair market value

of the houses transferred to Huber Investment over their cost should be treated as a tax-free contribution of capital under section 118. Since we have held that section 482 is not applicable herein we need not pass upon this issue. Further, in light of the inapplicability of section 482 we need not determine the fair market value of the houses transferred to Huber Investment.

*Decision will be entered under Rule 50.*