JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiff, Long Corporation, is a South Carolina corporation which has operated as a construction contractor since 1943. It files Federal income tax returns on the basis of a fiscal year ending March 31 and uses the accrual method of accounting, except that it uses the completed contract method of accounting with respect to long-term contracts. At all relevant times, plaintiff’s stock (except for qualifying shares) was owned by L. D. Long, plaintiff’s president.
In counts I and II of its petition, plaintiff sues to recover overpayments of income tax assessed for its 1952 and 1948 fiscal years, respectively. The tax payment involved in count I was occasioned by the Commissioner of Internal Bevenue’s refusal to allow a deduction, as an ordinary and *199 necessary business expense or business loss, of plaintiff’s excess of construction costs over the amount it received as the contract price for construction of an apartment building for its wbolly-owned subsidiary. Count II is predicated upon plaintiff’s contention that it should be allowed to carry back 1950 fiscal year losses attributable to assets acquired from another corporation which was merged into plaintiff on August 31, 1948. Plaintiff would use the carryback to offset pre-merger earnings (fiscal year 1948) of plaintiff’s construction business. We will discuss the counts in reverse order.
count n
On August 31, 1948, Grove Realty and Investment Company, the stock of which was owned by Mr. Long, merged into plaintiff. The assets of Grove Realty (nominated “Grove Division” after the merger) consisted principally of income-producing real estate.
After the merger, in fiscal year 1950, plaintiff suffered a net operating loss. This loss was attributable to the Grove Division’s assets. Plaintiff contends that it is entitled to carry back this loss to offset profits made by its construction operations in 1948; that is, prior to the merger. This would reduce the total Federal income tax due for fiscal year 1948, and if allowed, plaintiff would be entitled to a refund of the consequent overpayment.
The defendant, in denying the availability of the claimed carryback (it should be noted that the Commissioner of Internal Revenue would allow the loss to be carried over to plaintiff’s fiscal year 1952), relies primarily on the Supreme Court’s decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382 (1957).
We have had occasion, recently, to consider that case in Wisconsin Central Railroad Co. v. United States, 155 Ct. Cl. 781 (1961). As is relevant to the case at bar, we regarded the following as the Libson Shops rationale, quoting from Wisconsin Central at page 788:
The Supreme Court required that tax attributes of a pre-merger corporation could only be utilized to the extent that one could trace that corporation as a unit in *200 the resulting enterprise. Even then the pre-merger corporation’s losses could be used only to offset that unit’s income or, conversely, the unit's losses could be carried bach only to offset the income of its pre-merger form. [Emphasis added.]
Although the italicized phrase above was not essential to the resolution of the issue in Wisconsin Central, we see no reason to depart from this interpretation of Lisbon Shops.
Plaintiff argues that a Treasury Regulation[1] promulgated under the Internal Revenue Code of 1954 would allow the carryback on the facts as presented here. Plaintiff suggests that because the provision granting a net operating loss car-ryback in the 1954 Code[2] is in words similar to the grant of section 122(b)(1)(A) of the Internal Revenue Code of 1939[3] (pursuant to which plaintiff asserts its present claim), the regulation mentioned above should be authoritative in construing section 122(b) (1) (A).
We cannot agree. In the 1954 Code, the Congress reexamined its carryover and carryback policy in regard to corporate reorganizations. Section 381, in particular, expresses this policy by new and specific rules. Even assuming that the 1954 Code impliedly allows a carryback on facts as the plaintiff has proved, it certainly cannot be said that this is the interpretation that must be given a provision under the 1939 Code which was completely silent on the matter.
Even though the regulation cited may renounce the rule in Libson Shops as to this particular point, it is the Lihson Shops case, not the regulation, which is applicable to plaintiff’s tax years. That case adopts a “continuing enterprise” rather than a “strict entity” approach; and this test precludes plaintiff’s use of the carryback.
Further, as we stated in Wisconsin Central, page 784, footnote 3): “No inference is to be drawn from * * * [the 1954 Code] as to whether tax attributes can be utilized by a successor corporation under pre-existing law. See Koppers Co., Inc. v. United States, 133 Ct. Cl. 22, 34 (1955).”
*201 COUNT I
Prior to execution of the construction contract involved herein, plaintiff had transferred certain land to The Dar-lington, Inc., then a newly organized South Carolina corporation (hereinafter called “subsidiary”), in exchange for all the common stock of the latter, except qualifying shares. One hundred shares of the subsidiary’s preferred stock were issued to the Federal Housing Administration.
The FHA issued a commitment to insure a loan of $1,357,-700 to be used to finance an apartment building on this land. A factor in determining the size of the loan was the FHA’s estimate of the building and construction, and site improvement, costs as $1,159,676.
On December 7, 1949, plaintiff as contractor, and its subsidiary, as owner, executed an FHA form entitled: “Construction Contract — ‘Lump Sum.’ ” Pursuant thereto, plaintiff agreed to construct the apartment in accordance with FHA approved plans and specifications for a lump-sum price of $1,193,682.40. The contract price included construction and site improvement costs of $1,159,676, plus the contractor’s fee of $34,006.40.
The evidence clearly indicates that this construction contract was intended to be the final agreement between the two corporations. However, Article 3 of the contract did make the lump-sum price subject to modification for “additions or deletions” agreed upon by the parties with the approval of the FHA. But, “it being understood that the [FHA] at all times has the right to require compliance with the original Drawings and Specifications.”
After the contract was entered into, another experienced and reputable contractor offered to perform the contract in its entirety. The last of several offers to plaintiff by this contractor was some $10,000 below the lump-sum price for which plaintiff had agreed to perform the same work. Relying on the cost estimate by a competent estimator in plaintiff’s employment, Mr. Long concluded that plaintiff could perform the contract and make a minimum profit of approximately 11 percent. The offer was therefore rejected.
*202 Unfortunately, however, a prediction is only that. Unforeseen events, particularly war (the Korean) and weather, caused plaintiff’s construction costs to exceed the contract price by $238,039.27.
In addition, the plaintiff, as contemplated by Article 3 of the contract, performed certain “extras” which were of a type normally anticipated in this type of construction. The net cost of this work — less than 5 percent of the contract price — did not exceed $55,808.74.
Representatives of the two corporations reasonably anticipated that the subsidiary would be able to arrange for an increase in its FHA-insured loan in an amount sufficient to pay plaintiff for the net cost of the extras, plus a reasonable profit. Accordingly, detailed records were kept to show the amount of extra work done by subcontractors; it was contemplated that the extra work done by plaintiff’s own employees could be computed with reasonable accuracy at the completion of the contract.
The holder of the mortgage committed itself, subject to FHA approval, to increase the loan to the subsidiary by $75,000. This increase was intended to be a “round-figure,” it being expected that the FHA would approve an increase only in an amount sufficient to cover the cost of the extras (as finally determined), plus a reasonable profit thereon.
Again the parties guessed wrongly. The FHA would approve a maximum loan increase of only $7,000. Delay and expense involved in changing the documents made it unwise to seek an increase of such a small amount.
Because the subsidiary did not have sufficient funds to pay for the extras, and because the FHA, before allowing final disbursement of the loan, required plaintiff and the subsidiary to certify that there were no unpaid obligations outstanding, Mr. Long decided that plaintiff would have to absorb all costs in excess of the contract price, including the net cost of the extras. The plaintiff’s bookkeeper, however, allowed the cost of the extras to remain in construction costs, rather than making entries to show a capital contribution of this amount to the subsidiary. Mr. Long was not aware of this error. Except for this error, the books of both corporations were kept in the same manner as they would have been *203 if the parties bad been unrelated companies, dealing at arm’s length.
In its tax return for 1952 (fiscal year), plaintiff reported $1,193,682.40 of income from the construction contract. Plaintiff’s argument, then, is that it should be allowed to deduct the excess cost ($238,039.27), excluding the extras, over the contract price as a loss for its fiscal year 1952. We agree. Cost of the extras is, however, admittedly a contribution to the subsidiary’s capital for which no deduction is available.
Cases are legion which recognize the general principle that a taxpayer may organize his affairs as he chooses, but that if the form selected is a sham, the Government may disregard it. See, e.g., Higgins v. Smith, 308 U.S. 473 (1940), Alpha Tank and Sheet Metal Mfg. Co. v. United States, 126 Ct. Cl. 878 (1953).
In determining whether or not the form used was one of substance, and not a sham, this court has closely scrutinized those transactions in which a common ownership factor was present. Our approach has been to ascertain whether the transaction was “one that could have reasonably been made between parties dealing at arm’s length,” and if it were, a business loss would be deductible. George E. Warren Corp. v. United States, 135 Ct. Cl. 305, 312 (1956).
Careful examination of the evidence in the case before us can lead to no other conclusion but that the excess cost was a bona fide loss incurred in performing a contract which was entered into for the purpose of making a profit. Plaintiff and its subsidiary have dealt with each other as if they were entirely unrelated corporations.
The FHA still regulates the rents the subsidiary may charge for the apartments, and those rents have never been increased beyond that originally specified so as to recoup the loss which plaintiff now claims on the construction contract. Only the construction contract price has been received by the plaintiff out of the proceeds of the FIIA-insured mortgage loan. Other obligations discharged by payment of the loan proceeds were proper obligations of the subsidiary; no payment was made to discharge obligations incurred by plaintiff as contractor. That the contract price itself was *204 fair and reasonable is substantiated by the FHA estimate and another contractor’s willingness to perform the work at a figure substantially equal to that which plaintiff agreed to. Plaintiff has adequately explained why it decided to absorb the cost of the extra work rather than set up an accounts receivable. The remaining excess costs obviously had to be absorbed as the contract did not obligate the subsidiary to pay for them.
There is no question that there was a loss and that it was due principally to the Korean conflict. There is no doubt that if the contract had been let to an unrelated construction contractor, substantially the same loss would have been incurred for the same reason. Certainly the unrelated contractor could have deducted the excess cost thus occasioned as a business loss or expense.
Only if we were to hold that, as a matter of law, a loss is precluded whenever common ownership of transacting corporations is present, could we conscientiously uphold the Government’s position. This is not the law. The separate entity concept must be recognized unless circumstances are present which make such recognition farcical.
Two cases cited by the defendant, Johnson v. Commissioner, 24 T.C. 107 (1955), aff'd, 233 F. 2d 752 (4th Cir.), cert. denied, 352 U.S. 841 (1956), and V & M Homes, Inc. v. Commissioner, 28 T.C. 1121 (1957), aff’d, 263 F. 2d 837 (6th Cir. 1959), illustrate the other side of the coin. The courts in those cases emphasized that the parties did not deal with each other as would unrelated parties acting at arm’s length. They did not hold as a matter of law that related parties could not so deal. It was recognized that an arm’s length transaction could be possible, but that the burden of showing such had not been met. Plaintiff in the instant case has met this burden.
Since the plaintiff and its subsidiary must be regarded under the tax law as being separate and distinct entities, the defendant’s argument that the excess costs (in so far as cost is a measure of value) was reflected in the value of the subsidiary’s shares owned by plaintiff (and thus there was no economic loss) is not tenable.
*205 Plaintiff’s claim for refund under count II will be denied, with the petition as to this count dismissed. Its claim under count I will be granted.
Judgment will be entered for the plaintiff under count I with the amount of recovery to be determined pursuant to Eule 38(c).
It is so ordered.
Keed, Justice {Bet.), sitting by designation; Durfee; Judge/ and Laramore, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a suit for the recovery of $180,141.25, alleged to have been erroneously paid as income tax, negligence penalty and interest for the fiscal years ended March 31, 1948, and 1952 (hereafter sometimes referred to as “1948” and “1952”) together with interest thereon as provided by law.
2. The only issues are:
(a) whether, in the circumstances of this case, the Long Corporation is entitled to deduct, as a loss, the excess of its costs in performing a contract for the construction of an apartment project for its wholly-owned subsidiary, The Darlington, Inc., over the amount it received as the contract price for such construction.[4]
(b) whether the Long Corporation is entitled to carry back to its fiscal year ended March 31,1948 (before the merger of Grove Eealty and Investment Company into the Long Corporation on August 31, 1948) a net operating loss in its fiscal year ended March 31, 1950 (after the merger), or whether the loss in 1950 should be carried over to 1952.
3. Long Corporation is a South Carolina corporation engaged in the construction business and having its principal
*206 place of business in Charleston, South Carolina. It files Federal income tax returns on the basis of a fiscal year ending March 31 and uses the accrual method of accounting, except that it uses the completed contract method of accounting with respect to long-term contracts.
PACTS PERTINENT TO COUNT ONE
4. In its Federal income tax return for 1952, Long Corporation reported $1,193,682.40 of income from a contract (hereafter called the “Darlington contract”) for the construction of The Darlington, an apartment building in Charleston, South Carolina, for its wholly-owned subsidiary, The Darlington, Inc. It deducted construction costs of $1,-487,530.41 on the Darlington contract, so that it reported a loss of $293,848.01 attributable to that contract. Long Corporation now concedes that it should not have deducted $55,-808.74, the cost of certain extra work required by changes in the plans and specifications of the Darlington contract. Those additional costs it now concedes should have been treated as a contribution to the capital of the subsidiary. Accordingly, Long Corporation now contends that its correct loss, attributable to the Darlington contract, was $238,-039.27, rather than the $293,848.01 deducted in its return.
5. Plaintiff’s Federal income tax return for 1952 showed an overall net loss of $34,815.38 and no tax due.
Thereafter, the Commissioner of Internal Eevenue (hereafter referred to as the “Commissioner”) asserted against plaintiff a deficiency of $111,623.11, plus interest, in its income tax for 1952.
In computing the asserted deficiency, the Commissioner detei’mined that plaintiff’s net income for 1952 amounted to $225,236.75. In determining that amount of net income, the Commissioner:
(a) disallowed the deduction of $293,848.01 loss claimed by the plaintiff on the Darlington contract;
(b) allowed a net operating loss carryover of plaintiff’s net operating loss of $46,002.32 for its fiscal year ended March 31,1950 (hereafter sometimes referred to as “1950”) in computing plaintiff’s net operating loss deduction for 1952; and
*207 (o) did not allow a net operating loss carryback of any portion of plaintiff’s net operating loss for its fiscal year-ended March. 31,1954, in computing plaintiff’s net operating loss deduction for 1952.
On October 24, 1958, the Commissioner assessed against plaintiff the asserted deficiency of $111,623.11 in income tax for 1952 referred to above in this finding, plus interest of $41,557.44, or a total of $153,180.55, which was paid on November 3,1958.
6. Long Corporation, having paid the deficiency as de scribed in finding 5, filed a timely claim for refund, properly raising the issues presented in this suit, and after its rejection brought this suit within the time prescribed by law.
7. At all relevant times, all the stock of Long Corporation (except qualifying shares issued to directors) were owned by L. D. Long. Its officers included:
L. D. Long_President
Leonard L. Long_Vice President
T. E. Steadman-Secretary
8. The Darlington, Inc. was, and is now, a corporation created and existing under the laws of South Carolina. Its principal office and place of business is in South Carolina.
The issued and outstanding stock of The Darlington, Inc. consisted solely of the following:
(a) 1,247 shares of common stock of $100 par value owned by plaintiff;
(b) 3 qualifying shares of such common stock held by its directors as required by South Carolina law;
(c) 100 shares of preferred stock of $1 par value owned by the Federal Housing Administration (hereafter referred to as “FHA”).
9. Mr. L. D. Long has been engaged in the construction business for 46 years and has performed contracts for varied types of construction. Long Corporation has operated as a construction contractor since 1943.
10. During its fiscal year 1952, Long Corporation completed four construction contracts totaling $10,067,050.19, all of which were for separate but related corporations: The Darlington, Inc., in Charleston, South Carolina; The Dar-lington Corporation, in Atlanta, Georgia; The Howell House, *208 Inc., in Atlanta, Georgia; and Chamblee Acres, Inc., in Atlanta, Georgia. The total net loss of $34,815.38 reported by Long Corporation for 1952 included its income and its losses on the four contracts.
On one of the four contracts completed in fiscal 1952 (the one with The Darlington Corporation[5] for the construction of The Darlington Apartments in Atlanta, Georgia), Long Corporation reported a net profit of $587,927.77, which was offset by losses reported on the other contracts.
In constructing The Darlington Apartments in Atlanta, Long Corporation avoided some of the problems that caused losses in constructing The Darlington in Charleston, including price increases caused by the Korean war.
The construction of The Howell House, like the construction of The Darlington in Charleston, was contracted for before the Korean war, but was carried out during the war. Long Corporation incurred a loss on The Howell House, the amount of which does not appear in this record.
The Commissioner has not questioned either the amount of income earned on The Darlington Apartments in Atlanta or the amount of the loss incurred on The Howell House.
The Howell House and The Darlington Apartments, in Atlanta, were financed with mortgages insured under Section 608 of the National Housing Act. Mr. L. D. Long owned 80 percent, and his son, Leonard L. Long, owned 20 percent of the stock of Choice Kealty Company, which, except for qualifying shares, owned all of the stock of The Darlington Corporation and The Howell House, Inc.
11. Before entering into the Darlington contract involved in this suit, Long Corporation had transferred to The Dar-lington, Inc., a South Carolina corporation then newly organized, the land in Charleston, South Carolina, on which The Darlington was subsequently constructed, in exchange for all the stock of The Darlington, Inc., except three qualifying shares of $100 par value, issued to directors for $300 in cash, and 100 shares of preferred stock issued to FHA. The land had been appraised by FHA at $125,000.
*209 12. Prior to the date of the Darlington contract, FHA had issued to The Darlington, Inc. a commitment under Section 608 of the National Housing Act for the insurance of a loan of $1,357,700 to finance the project for the construction of The Darlington.
13. The FHA commitment was based on an estimate by FHA dated 8-19-49, that The Darlington could be constructed in accordance with certain approved plans and specifications at a construction cost of $1,159,676 (the sum of building construction costs of $1,155,495 and site improvements of $4,181), and that the remainder of the loan would be required for the architect’s fee, the contractor’s fee, financial costs, and other necessary expenses during the construction period.
14. FHA’s “Estimate of Present Eeplacement Cost of Property” as of the date of the commitment was as follows:
1. Improvements to Land_ $4,181. 00
2. Structures_ 1,155,495.00
3. Fees_ 124,955. 00
4. Carrying Charges, financing- 97,046.10
5. Legal & Organization_ 2,106.00
6. Fair market price of land_ 125,000.00
7. Total estimated present cost- 1, 508, 78S. 10
15. Pursuant to the FHA commitment for insurance, The Darlington, Inc. made an agreement with Echo Fire and Title Insurance Company (also a wholly-owned subsidiary of Long Corporation) for a mortgage loan of $1,357,700 to be disbursed during construction of The Darlington. Echo Fire and Title Insurance Company sold the mortgage to an eastern financial institution and thereafter serviced the mortgage for a fee.
16. On December 7, 1949, Long Corporation, as contractor, and The Darlington, Inc., as owner, executed an FHA form called “Construction Contract — ‘Lump Sum’,” whereby Long Corporation agreed to build The Darlington in accordance with FHA approved plans and specifications for a lump-sum price of $1,193,682.40 “subject to additions and deductions.”
Under the contract, the contractor agreed to furnish the owner with assurance of completion in the form of a per *210 sonal indemnity agreement, signed by L. D. Long, in the amount of $120,000. In executing the contract, L. D. Long, President, and T. E. Steadman, Secretary, signed on bebalf of Long Construction Company, a division of Long Corporation, as Contractor, and L. D. Long, President, and T. E. Steadman, Secretary, signed on behalf of The Dar-lington, Inc., as Owner.
17. The contract price equaled the sum of the contractor’s fee of $34,006.40 and the FHA estimate of construction costs of $1,159,676.
18. The construction contract between The Darlington, Inc. and Long Corporation was intended by the officers of these two corporations, and in particular by Mr. Long, to represent the final agreement between the two corporations for construction of the building, in accordance with the approved plans and specifications incorporated in the contract, at the specified contract price, subject to modification only for additions or deletions agreed upon by the two corporations with the approval of FITA. It was the intent of the parties to the contract that Long Corporation, as contractor, was to be paid only the amounts provided in Article 3, which read:
The Owner shall pay the Contractor for the performance of the Contract, subject to additions and deductions provided herein on account of construction the sum of $1,159,676.00 cash and in addition thereto, as a fee, $34,006.40 cash and No shares of the Common stock of the Owner.
All requests for changes in the Drawings and Specifications must be in writing signed by the Owner and the Lender and shall be conditioned upon the approval of the Commissioner, which approval may be subject to such conditions and qualifications as the Commissioner in his discretion may prescribe, it being understood that the Commissioner at all times has the right to require compliance with the original Drawings and Specifications.
The Contractor shall assume full responsibility for the maintenance of such landscaping as may be required by the Drawings and Specifications until such time as both parties to this Contract shall receive notice in writing from the Commissioner that the work has been satisfactorily completed. The Owner hereby agrees to *211 make available to tbe Contractor, without cost to the latter, such facilities as water, hose, and sprinkler.
19. Before the Darlington contract was executed, Mr. Long had a detailed estimate of the cost of performing the contract made by a competent and reliable construction estimator employed by Long Corporation. Based upon his review of that estimate, Mr. Long concluded that Long Corporation could perform the Darlington contract for the lump-sum contract price and make a minimum profit of approximately 11 percent of such price.
20. During January or February of 1950, before Long Corporation had begun to do any work on the contract, Mr. Long received a bona fide offer from Skinner & Ruddock, Inc., a reputable and competent contractor with experience in multistory construction, to perform the Darlington contract in its entirety and to give a surety bond for proper performance. The amount of the offer by Skinner & Ruddock, Inc. was a few thousand dollars less than the lump-sum contract price for which Long Corporation had agreed to do the same work.
21. After considering the offer by Skinner & Ruddock, Inc. and discussing it with personnel of Long Corporation, Mr. Long decided to reject the offer because he believed that Long Corporation could perform the Darlington contract and make a reasonable profit.
22. Long Corporation awarded Skinner & Ruddock, Inc. a subcontract to do the foundation work on The Darlington. During the period January through June of 1950, while this subcontract was being performed, Skinner & Ruddock, Inc. made several offers to take over the entire contract, and finally reduced the amount of its offer by approximately $10,000. Mr. Long rejected these offers.
23. The Darlington contract was regarded as providing a fair and reasonable price for performing the construction work covered by the contract, both by the parties to the contract and by a contractor, completely unrelated to the owner, who had full opportunity to consider the costs likely to be involved in its performance.
24. Except in the particulars hereafter described in findings 32 and 34, the books and records of Long Corporation *212 and The Darlington, Inc. were kept in the same manner as they would have been kept if the parties had been unrelated companies, dealing at arm’s length.
25. The loss incurred by Long Corporation in its performance of the Darlington contract resulted, at least in part, from factors, unanticipated and unforeseen when the contract was entered into, which caused its construction costs to exceed its estimate. Between the execution of the contract on December 7,1949, and the time when the major part of the construction work was performed, the advent of the Korean war in the summer of 1950 caused unexpected increases in the amounts which Long Corporation had to pay for materials and for work done by subcontractors. Because of military construction in the Charleston area, an unusual shortage of construction workers developed, which not only resulted in wage increases, but also forced Long Corporation to bring in brick masons from Atlanta, to pay their transportation expenses and provide them with lodgings, and, even though unusually rainy conditions were encountered, to guarantee them 40 work hours per week. Long Corporation was also compelled to use union labor in Charleston because it was using union labor on other construction in Atlanta, and it was plagued by poor performance by supervisory personnel, in contrast to good experience on other construction contracts. The winter of 1950-51 was abnormally severe and caused unusual expenses. The foundation work cost more than had been estimated because pilings had to be driven deeper than test borings had indicated would be necessary to meet the specifications. A reputable index for the cost of this type of construction in the Southeastern United States showed an increase from 180.6 in 1949 (the year in which the contract was signed) to 204.2 in 1951 (the year in which the bulk of the work was performed).
26. Long Corporation constructed The Darlington in accordance with the original FHA-approved plans and specifications as provided in the Darlington contract, except for certain changes in the plans and specifications agreed upon by representatives of Long Corporation and The Darlington, Inc. during the course of construction, and approved by FHA. These changes, which in one instance decreased costs but *213 otherwise increased costs, were of the sort normally anticipated as “extras” in this type of construction. The net cost of the extra work required by these changes did not exceed $55,808.74 — less than 5 percent of the contract price — and was relatively low for this type of construction.
27. Some of the agreed changes in the plans and specifications that gave rise to the extra work were required for partitioning and similar work in order to make the first floor commercial rental area conform to the needs of tenants who had been obtained during construction. Other changes were required to cure defects in design and to provide substitutes for unobtainable materials. Another change involved the addition of air-conditioning equipment in the commercial area, so that the entire building would be air-conditioned.
28. The representatives of Long Corporation and The Darlington, Inc. anticipated, in accordance with normal practice on this type contract, that at the conclusion of the construction there would be a careful and detailed accounting for the net cost of extras and a charge by Long Corporation to The Darlington, Inc. in an amount equal to such net cost plus a reasonable profit. Anticipating such an accounting, Mr. T. E. Steadman, the head of the bookkeeping departments for both corporations, gave instructions for records to be kept showing the amount of extra work done by subcontractors, which covered about 90 percent of the extra work. The remaining portion of the extra work was done by employees of Long Corporation, and its cost would be computed with reasonable accuracy at the completion of the construction.
29. The representatives of Long Corporation and The Dar-lington, Inc. anticipated that The Darlington, Inc. would be able to arrange for an increase in its FHA-insured loan in an amount sufficient to pay Long Corporation for the net cost of extras plus a reasonable profit. Mr. Long had been assured by FHA personnel and by experienced personnel within his own organization that FHA would approve such an increase.
39. Pursuant to the understanding that The Darlington, Inc. would procure an increased loan sufficient to pay Long Corporation for the cost of extras plus a reasonable profit, *214 Mr. Frank H. Massey, an officer of Echo Fire and Title Insurance Company and a former zone attorney for FHA, requested a commitment from the holder of the mortgage, subject to FHA approval, to increase the loan to The Dar-lington, Inc. by $75,000, and the commitment was granted by the holder of the mortgage. The $75,000 loan increase requested was a “round figure,” made without any exact determination of the cost of extras or of the amount of a reasonable profit, but with the expectation that it would be ample to cover the value of the extras as finally determined upon an accounting reviewed and approved by FHA.
In submitting Long Corporation’s request for the increase to FHA, Mr. Massey summarized the increased costs that had resulted from the problems that had been encountered in constructing the building, as well as those attributable to the extras, and stated a total figure of $372,000, which included both. However, he asked approval only of an increase of $75,000 to cover the extras. It was anticipated that FHA would approve an increase in the loan only in an amount sufficient to pay for the cost of the extras in whatever amount was finally determined, plus a reasonable profit thereon. Eepresentatives of Long Corporation and The Darlington, Inc. intended that any additional amount paid by The Darlington, Inc. to Long Corporation, as a result of the final accounting, would be no more than a fair price for the extra work.
31. The maximum increase in the loan that FHA was willing to approve was only $6,000 or $7,000. This amount was not deemed large enough to justify the delays and expenses involved in changing the documents.
32. The failure of FHA to approve an increase in the loan to cover the extras left The Darlington, Inc. with no funds available from which to pay Long Corporation for the extras. In order for The Darlington, Inc. to obtain the final disbursement of the loan, FHA required both Long Corporation and The Darlington, Inc. to certify, upon completion of the project, that there were no unpaid obligations outstanding. Mr. L. D. Long personally had guaranteed to FHA that the project would be completed in accordance with the contract and the approved plans and specifications. In *215 these circumstances, Long Corporation and The Darlington, Inc. refrained from setting up accounts payable and accounts receivable reflecting the existence of an obligation on the part of The Darlington, Inc. to pay for such extras, and Mr. Leonard L. Long, Vice President of Long Corporation, certified under oath, on September 4,1951, that The Darlington, Inc. had been completed in every detail; that $1,193,682.40 had been paid in full under the contract with no exceptions; that all subcontractors, materialmen, and laborers had been paid in full and had accepted such payment in full settlement of all claims, and that there were no claims outstanding at that time which would entitle the holder thereof to claim a lien against The Darlington, Inc.; and that the contractor, Long Corporation, waived and released all right to file a mechanic’s or materialman’s lien against the property.
33. Because of the failure of The Darlington, Inc. to obtain an increase in its loan, because of its lack of other funds from which to make the payment, and for the reasons set forth in finding 32, Mr. Long concluded that Long Corporation would have to absorb the net cost of the extras.
34. After The Darlington, Inc. was denied a loan increase to enable it to pay for the extra work, Mr. Steadman, Secretary and Comptroller of both the Long Corporation and The Darlington, Inc., gave consideration to the problem of determining how the costs of the extra work should be handled on the books of the two corporations and concluded, for the reasons set forth in finding 32, not to enter on the books a charge by Long Corporation to The Darlington, Inc. for the extra work.
35. Mr. Steadman did not review the bookkeeping treatment of the costs of the extra work either with Mr. Long or with the independent auditors who prepared and signed the Federal income tax return of Long Corporation for the year in question.
36. Mr. Long was not personally aware of the manner in which the costs of the extra work were handled on the books and tax returns of Long Corporation. He was accustomed to rely upon his bookkeeping department and on his independent auditors to see to the proper handling of such items and did so in this case.
*216 37. The income and expenses of Long Corporation in performing the Darlington contract were as follows:
Gross income per contract_ $1,198, 682.40
Total costs of construction of The Darlington_$1,487,530.41
Less additional costs of extra work required by changes in plans and specifications_ 55, 808.74
Expenses incurred in complying with the original plans and specifications_ 1,431,721.67
Loss on complying with original plans and specifications_ $238,039.27
38. The parties have stipulated that the proceeds of the FHA-insured mortgage loan (in the amount of $1,357,700) secured by The Darlington, Inc. were disbursed by or on behalf of The Darlington, Inc. as follows:
Construction contract price-$1,193, 615.40
Architect’s fee_ 42,496.08
Interest during construction to 9/1/51_ 41,474.27
Insurance during construction_ 5,512.44
Taxes during construction_ 640. 95
FHA mortgage insurance during construction_ 6, 788. 50
FHA application fee_ 2, 077.50
FHA commitment fee_ 1, 995. 60
FHA inspection fee_ 6, 788. 50
Financing fee_ $20,365.50
Title insurance- 2,221.55
Legal fee_ 4, 000. 00
FHA note stamps_ 453.08
Organization expense_ 755.68
Working capital escrow deposited with mort-gagee_ 20,365.50
Deposit for off-site work- 850.00
Furniture and equipment_ 3, 019.81
Miscellaneous expenses- 2,949. 66
Principal payments on mortgage 6/51-9/51- 6, 788.48
Reserve for replacements 6/51-9/51_ 1,371. 00
Gross expenditures_[6] $1, 364, 619.48
Less refunds 9/19/51- 11,581.40
Net expenditures_[6] $1,353,038.08
All of these disbursements discharged proper obligations of The Darlington, Inc., and none of them discharged obli *217 gations incurred by Long Corporation as contractor under the terms of the Darlington contract.
39. The FHA still regulates the rents which The Darling-ton, Inc. may charge for apartments in The Darlington. The rents charged by The Darlington, Inc. have never been increased over those originally specified and have not in any manner reflected the loss incurred by Long Corporation on the contract.
40. The loss of $288,039.27 incurred by Long Corporation in the construction of The Darlington apartments in Charleston was a bona fide loss incurred in carrying out a contract that was entered into and performed by Long Corporation with the purpose of making a profit.
41. As stipulated by the parties, Long Corporation is entitled to an additional deduction in 1952 of $15,550.67 as a net operating loss carryback from 1954.
42. If the loss incurred by Long Corporation in the construction of The Darlington at Charleston should be found to be deductible, the corrected net income of Long Corporation for its 1952 fiscal year would be as follows:
Net income per return (loss)_ ($34,815.38)
Agreed adjustments (including 1954 net operating loss carryback)_($3,344.23)
Conceded disallowance for net cost of extras on construction of The Dar-lington at Charleston_ $55,808.74 $52,464.51
Corrected net income*_ $17,649.13
PACTS PERTINENT TO COUNT TWO
43. For 1948, plaintiff’s Federal income tax return showed a net income of $117,547.93 and a tax due of $44,668.21, which was paid as follows: $11,167.05 on March 18,1948; $11,167.05 on June 16, 1948; $11,607.05 on September 17, 1948; and $11,167.05 on December 15,1948.
44. After the filing of plaintiff’s 1948 return, the Commissioner asserted against plaintiff a deficiency of $30,356.21 in its income tax for 1948, plus interest and a negligence penalty of $1,517.81.
*218 45. For 1950, plaintiff bad a net operating loss of $46,002.32.
46. Plaintiff’s net operating loss of $46,002.32 for 1950 was attributable to that portion of its assets which it operated as The Grove Division. Its deductions for Federal income tax purposes for 1950 attributable to The Grove Division assets exceeded its income during that fiscal year attributable to those assets by more than $46,002.32.
47. Before August 31, 1948, The Grove Division’s portion of plaintiff’s assets, which consisted principally of income-producing real estate, had been owned by a separate South Carolina corporation known as Grove Fealty and Investment Company, all of the stock of which was owned by L. D. Long. On August 31, 1948, Grove Fealty and Investment Company was merged into Long Corporation in order to include more assets in the Long Corporation, to build up the financial responsibility of the Long Corporation, and to improve Long Corporation’s credit rating in Dun & Bradstreet or with the banks.
48. Long Corporation filed a timely claim for refund of Federal income tax paid with respect to 1948 on the ground that it was entitled to deduct, as a net operating loss carry-back, the $46,002.32 loss incurred in 1950. After rejection of the claim for refund, Long Corporation brought this suit within the time prescribed by law.
49. If plaintiff was entitled to deduct its net operating loss of $46,002.32 for 1950 as a carryback to 1948, it has overpaid its income tax for 1948 by $17,480.80 and has overpaid interest assessed for 1948 in an amount to be determined as provided by law.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover under count I of its petition. Judgment will be entered to this effect with the amount of recovery to be determined pursuant to Fule 38(c).
It is further concluded that plaintiff is not entitled to recover under count II of its petition, with the petition as to this count dismissed.
*219 In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 23,1962, that judgment for plaintiff be entered for $153,180.55, with interest as provided by law from November 3, 1958.

 Treas. Reg. § 1.381(c) (1)-1(b) (1960).

 26 U.S.C. (I.R.C. 1954) § 172(b)(1) (1958 Ed.).

 26 U.S.C. (I.R.C. 1939) § 122(b) (1) (A) (1952 Ed.).

 In the interest of brevity, such excess of construction costs over the contract price is sometimes referred to hereafter as the Long Corporation’s “loss” on the contract, without, however, purporting thereby to express or to suggest any conclusion in respect of the legal question whether the amount so described should be recognized as a Iosb for tax purposes.

 To be distinguishes from The Darlington, Inc., which owned the Dar-lington Apartments in Charleston.

 The total figures for “Gross expenditures” and “Net expenditures,” as stipulated by tbe parties, exceed by $90 the correct totals of $1,364,529.48 and $1,530,048.08 resulting from the addition of the several amounts stipulated as disbursed out of loan proceeds for particular purposes. It has been impossible to identify the exact source of this difference from the evidence in the record.

It the 1950 net operating loss of $46,002.32 is not allowable as a carry-back to 1948 as contended by plaintiff, then such loss is deductible as a carryover to 1952, and plaintiff would have no taxable income for 1952.