BALDWIN BROTHERS, INC., Petitioner in No. 15691,

J. Robert Baldwin and Ruth D. Baldwin, Petitioners in No. 15692,

Tenth Street Building Corporation of Erie, Petitioner in No. 15693,

Baldwin Builders, Inc., Petitioner in No. 15694,

Arthur W. Baldwin and Nancy F. Baldwin, Petitioners in No. 15695,

v.

COMMISSIONER OF INTERNAL REVENUE.

Nos. 15691–15695.

United States Court of Appeals Third Circuit.

Argued March 24, 1966.

Decided June 9, 1966.

Rehearing Denied June 30, 1966.

John E. Britton, Erie, Pa. (Gifford, Graham, MacDonald & Illig, Erie, Pa., on the brief), for petitioners.

Loring W. Post, Atty., Dept. of Justice, Tax Div., Washington, D. C. (Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN, HASTIE and GANEY, Circuit Judges.

OPINION OF THE COURT

HASTIE, Circuit Judge.

The matter in dispute in each of these five petitions is a determination by the Commissioner, sustained by the Tax Court, that, in the computation of income taxes, losses suffered in the operation of an apartment building during 1960 and 1961 were not deductible by the taxpayer

who incurred them as lessee operator of the enterprise, but should be allocated under section 482 of the 1954 Internal Revenue Code to the taxpayer's controlled corporation, which was the owner and lessor of the building.

The facts of the case which concerns the project called Baldwin Gardens No. 2 are typical and differ in no significant way from the facts in the companion cases. Baldwin Gardens Apartments, Inc. No. 2 was incorporated in Pennsylvania in 1951 to provide housing for rent or sale in Erie under section 207 of title II of the National Housing Act. With financing provided by a bank loan approved and guaranteed by the Federal Housing Administration, the new corporation built Baldwin Gardens No. 2, a project of 4 buildings containing 56 apartments. The sponsor of this undertaking was J. Robert Baldwin, a substantial and successful builder and real estate operator. Since 1956 all of the common stock of Baldwin Gardens Apartments, Inc. No. 2 has been owned by the petitioner Baldwin Brothers, Inc. J. Robert Baldwin is president of both corporations.

In 1959 Mr. Baldwin became concerned about the decline of occupancy in Baldwin Gardens and the overall bad picture of the management, maintenance and finances of the project. Occupancy had declined to about 70 per cent, with the result that the corporate owner was not earning enough money to meet its next mortgage payment. It could not borrow any more money because its charter prohibited it from incurring additional indebtedness. A default under the FHA guaranteed mortgage would impair the standing of future Baldwin applications for FHA financing.

Seeking to save the venture from catastrophe, the parties decided that the controlling corporation, Baldwin Brothers, Inc., would lease 55 of the 56 apartments from Baldwin Gardens Apartments, Inc. No. 2, and attempt to sublease them, improving the entire operation in the process. The initial lease was for 10 months from July 1, 1959 through April 30, 1960. The lease was renewed for two terms of one year each. The annual rent was $39,600. This arrangement enabled the lessor as owner to continue to meet its obligations under the mortgage.

Though the lease did not so specify, it was the understanding of the parties that the lessee, Baldwin Brothers, Inc., would bear all operating expenses of the venture, including maintenance of the property, redecoration and renovation of apartments as needed, and the cost of utilities.

Under this arrangement, Baldwin Brothers, Inc. sustained substantial losses under the original 10 month lease and each of the succeeding annual leases. Actually, the rent received by the lessee from its tenants just about equaled the rent which it paid to the lessor, leaving the lessee with no income from the apartments to cover maintenance and other necessary operational costs. The Tax Court found that the lessee's operating loss for the period of the first 10 month lease was $19,278.86; for the year ending April 30, 1961, $12,163.83; and for the year ending April 30, 1962, $17,663.87. Also relevant are the Tax Court's findings that both the percentage of occupancy and the net income of the Baldwin Gardens No. 2 project had declined each year beginning with 1956, with the enterprise showing a substantial loss for the fiscal year which ended shortly before Baldwin Brothers, Inc. took over the operation.

In these circumstances, the Tax Court concluded that the Commissioner's action in disallowing the deductions claimed by Baldwin Brothers for the above described losses in its 1960 and 1961 income tax returns and allocating those losses to Baldwin Gardens Apartments No. 2, was a proper exercise of administrative authority and discretion, expressly conferred upon him by section 482 of the 1954 Internal Revenue Code, 26 U.S.C. § 482, to allocate income and deductions among organizations owned by the same interests "if he determines that such * * * allocation is necessary in order * * * clearly to reflect

the income of any of such organizations * * *." The taxpayer contends that this allocation lacked rational justification and should be set aside as arbitrary.

The pertinent Treasury Regulation, 26 C.F.R., § 1,482–1(c) specifies that "authority to determine true taxable income extends to any case in which * * * the taxable income * * * of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer". The propriety of this regulation is not challenged. Indeed, this formulation of the circumstances in which allocation under section 482 is reasonable and proper merely adopts a test which the courts have repeatedly stated and applied to sustain or reject particular determinations. Long Corp. v. United States, 1962, 298 F.2d 450, 156 Ct.Cl. 197; Davis v. United States, 10th Cir., 1960, 282 F.2d 623; Johnson v. Commissioner of Internal Revenue, 4th Cir., 1956, 233 F.2d 752, cert. denied 352 U.S. 841, 77 S.Ct. 63, 1 L.Ed.2d 57; V & M Homes Inc., 1957, 28 T.C. 1121, aff'd 6th Cir., 1959, 263 F.2d 837.

■■■ In this case we think the record clearly shows that the parties undertook to create a situation which would in obvious likelihood shift the burden of an unprofitable operation from the owner to a lessee, and that no independent person bargaining at arm's length in his own economic interest would have accepted a lease so freighted with the prospect of loss. The Tax Court found that the "evidence as a whole does not sustain the petitioners' contention that the rent and expenses which the lessees agreed to pay were reasonable in amount under the known conditions or that the lessees had a fair prospect of profit from the anticipated sub-leasing". Our independent study of the record persuades us that the quoted factual conclusions are amply supported by the evidence. Of course the burden is on the taxpayer to establish that the challenged ruling was arbitrary. National Securities Corp. v. Commissioner of Internal Revenue, 3d Cir., 1943, 137 F.2d 600.

The income tax returns of Baldwin Brothers, Inc. show that as lessee it spent a total of approximately $54,000 per year during 1960 and 1961 for rent and operating costs of the Baldwin Gardens No. 2 project. At the same time the lessee had adopted a rental scale which would yield a maximum of almost $60,000 for 100 per cent occupancy. Thus, an average occupancy rate of about 90 per cent would have been necessary to avoid a loss. When Baldwin Brothers took over the operation as lessee the occupancy rate was only 71 per cent after a two year decline. It is true that Robert Baldwin testified that mismanagement and inadequate maintenance had been factors in this decline and that in 1959 he believed the operation could be made profitable. However, it is also a fact that, for whatever reasons, occupancy continued to decline to less than 65 per cent in 1960, yet this experience did not deter the lessee from renewing the lease in 1961.

It is also relevant that the short term 1959 and 1960 leases gave the lessee a right to renew only for a further term of six months. Under the most optimistic view it would have taken time to make the venture profitable. Yet, the lessee was willing to spend substantial sums for renovations, repairs and promotional costs with the practical certainty that losses would be sustained at the outset without demanding any more protection for its investment than a ten or twelve month lease with a privilege of renewal for another six months. It is incredible that an independent entrepreneur would have been willing thus to invest in an at least temporarily losing venture with no assurance that he could retain the leasehold long enough to make it profitable or even to recoup his initial losses.

In addition there is testimony, albeit rather confused, by an appraiser for the Internal Revenue Service estimating the fair annual rental value of Baldwin Gardens No. 2 to an independent profit seek-

ing lessee who would bear all operation costs at less than $24,000, as contrasted with the $39,000 paid by the lessee.

In our view the above summarized evidence strongly indicates that the successive short term leases were not such transactions as an independent person seeking to lease and operate an apartment building at a profit would have seriously considered. This conclusion is fatal to the petitioner's claims. For the admitted control of lessor by lessee together with the persuasive evidence that the leases were not such as an uncontrolled taxpayer would have made dealing at arm's length with another uncontrolled taxpayer, suffice to bring the allocation of income and deductions derived from the venture to the controlled lessor rather than the lessee within the discretion which section 482 vests in the Commissioner.

The decision of the Tax Court will be affirmed.