George A. Dozier and Dixie G. Dozier v. Commissioner.
Dozier v. Commissioner
Docket No. 880-64.
United States Tax Court
T.C. Memo 1967-97; 1967 Tax Ct. Memo LEXIS 163; 26 T.C.M. (CCH) 467; T.C.M. (RIA) 67097; May 5, 1967
*163 Petitioner's subcontractor on two highway construction projects became unable to meet payments for taxes, labor, supplies, materials and for equipment and, in order to avoid any interruption on the projects, petitioner undertook to make the necessary payments until work was completed. As collateral for his expenditures, petitioner took back a second mortgage on the subcontractor's home and on certain road construction equipment. The subcontractor also assigned corporate stock and policies of life insurance to petitioner. Records were kept by both parties showing the amounts received and expended by petitioner on the subcontractor's behalf. In June 1962, the parties executed a settlement agreement to settle matters between them. Petitioner used the completed contract method of accounting for income realized from his highway construction contracts. In August 1961 work was completed on the Shelby County job. However, there was substantial difference between the amount claimed by petitioner for the work done and the admitted liability of the State Highway Department. A recheck was made and in 1962 the State Highway Department made payments to petitioner greatly in excess of its admitted *164 liability in 1961. Held, under these facts the parties intended a debtor-creditor relationship in connection with the expenditures made by petitioner on the subcontractor's behalf and the outstanding obligations of the subcontractor to petitioner did not become worthless to any extent prior to 1962. Held, further, in view of the dispute existing in 1961 over the entire amount payable on the Shelby County job, the contract was properly closed into income in 1962. Harold I. Apolinsky and Joseph S. Bluestein, for the petitioners. Homer F. Benson, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1958, 1959, 1960 and 1961 in the respective amounts of $6,971.97, $3,490.88, *165 $108.80 and $61,332.47. The years 1958 and 1959 are involved because of the disallowance of a net operating loss carryback. Petitioner concedes the 1960 deficiency in the sum of $108.80. The issues are (1) whether certain payments made by petitioner George A. Dozier during the course of highway construction jobs should be characterized as costs incurred by Dozier on such construction jobs or whether such payments were in fact loans made to a subcontractor, and (2) whether, under the completed-contract method of accounting, the income from a highway construction job was properly includable in petitioners' income in 1961 or 1962. Findings of Fact Some of the facts were stipulated and they are so found. George A. Dozier and Dixie G. Dozier, husband and wife, are residents of Montgomery, Alabama. They filed a joint Federal income tax return for 1961 with the district director of internal revenue, Birmingham, Alabama. Since 1946 and during the years here involved, petitioner George A. Dozier was engaged in highway construction work either as a prime contractor or as a subcontractor. He used the completed-contract method of accounting and reporting taxable income realized from *166 contracts for highway construction. In 1948 petitioner and Jack R. Bryant began working together on road contracting jobs. Petitioner supplied the bonding power, without which the contracts could not have been obtained, and Bryant was his unbonded subcontractor who did the work with his men and equipment. In general, petitioner retained an agreed percentage of the estimate payments received as the work progressed and turned the balance over to Bryant. Petitioner did have some equipment which was used on some of the jobs. On December 28, 1958, petitioner was awarded a contract by the Alabama State Highway Department to build 6.689 miles of Interstate Highway No. 65 in Shelby County, Alabama. On January 5, 1960, the petitioner, as prime contractor on the Shelby County project, subcontracted a portion of the project to J. R. Bryant (doing business as J. R. Bryant Contracting Co.) to the extent of $2,382,850.46 and also subcontracted a portion of the project to Montgomery Construction Company to the extent of $186,085.23. The subcontract with Bryant provided, in part, as follows: Article XIII(a) Should Sub-contractor at any time breach this agreement or fail to prosecute the said *167 work with promptness, diligence and efficiency, or fail to perform any of the requirements hereof, Contractor may without notice (or, if notice be required by law, then after twenty-four hours written notice either by registered mail addressed to Sub-contractor at 1103 Bell Building, Montgomery, Alabama or by posting in some conspicuous pace on the job) proceed as follows: 1. Provide such materials, supplies, equipment and labor as may be necessary to complete said work, pay for same and deduct the amount so paid from any money then or thereafter due Sub-contractor, or 2. Terminate the employment of Subcontractor, enter upon the premises and take possession, for use in completing the work, of all the materials, supplies, tools, equipment and appliances of the Subcontractor thereon and complete the work, or have same completed by others, and be liable to Sub-contractor for no further payment under the agreement until final payment is due and then only if and to the extent that the unpaid balance of the amount to be paid under this Sub-contract exceeds the expense of the Contractor in finishing the work. (b) If the amount expended by Contractor under 1, above or the cost of completing *168 the work under 2, above exceeds the unpaid balance of Sub-contract price herein stated, Sub-contractor shall pay Contractor such excess. (c) Should Sub-contractor at any time fail to pay for all labor, materials or supplies used by Sub-contractor in said work when due, Contractor may, at his option, pay for same and charge to Sub-contractor; or may, at his discretion, and with the consent of Sub-contractor, pay at any time claims for labor, materials and supplies used in the work. (d) Should Sub-contractor default in any of the provisions of this Sub-contract and should Contractor employ an attorney to enforce any provision hereof or to collect damages for breach of the Subcontract or to recover on the bond mentioned in Article XII above, Sub-contractor and his surety agree to pay Contractor such reasonable attorney's fees as he may expend therein. As against the obligations herein contained Sub-contractor and his surety waive all rights of exemption. On March 29, 1960, petitioner was awarded a subcontract by H. W. Caldwell & Son, Inc. for work to be performed on a section of Interstate Highway No. 65 in Butler-Conecuh Counties, Alabama. H. W. Caldwell & Son, Inc. was a subcontractor *169 of Hyde Construction Co., Inc. on the Butler-Conecuh Counties project. On April 15, 1960, petitioner entered into a subcontract with Bryant covering a portion of the work to be performed on the Butler-Conecuh Counties project under this subcontract between Bryant and petitioner. Bryant was required to furnish all labor, materials and equipment and perform all work required on the relevant portion of the Butler-Conecuh Counties project. The subcontract executed by petitioner and Bryant incorporated by reference all applicable clauses and conditions of the subcontract executed between H. W. Caldwell & Son, Inc. and the Hyde Construction Co., Inc. Article VIII of the latter subcontract provided as follows: Should the Sub-Contractor at any time refuse or neglect to supply a sufficient number of properly skilled workmen, or a sufficient quantity of materials of proper quality, or adequate equipment and tools, or fail in any respect to prosecute the work covered by this Sub-Contract, with promptness and diligence, or fail in the performance of any of the agreements herein contained, the Contractor may, at [his] option, after forty-eight hours written notice to the Sub-Contractor, provide *170 any such labor and materials, and deduct the costs thereof from any money then due or thereafter to become due the Sub-Contractor under this Sub-Contract: or, the Contractor may, at his option, terminate the employment of the Sub-Contractor for the said work, and shall have the right to enter upon the premises or site and take possession for the purpose of completing the work included under this Sub-Contract, of all equipment, materials, tools and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefor, and in case of such discontinuance of the employment by the said Contractor, said Sub-Contractor shall not be entitled to receive any further payments under this Sub-Contract until the said work shall be wholly finished; at which time, if the unpaid balance of the amount to be paid under this Sub-Contract exceeds the expenses incurred by the Contractor in finishing the work, such excess shall be paid by the Contractor to the Sub-Contractor; but, if such expenses shall exceed the unpaid balance, then the Sub-Contractor shall pay the difference to the Contractor. The expense incurred by the Contractor, as herein provided, either *171 for furnishing materials or for finishing the work, and any damages incurred by such default shall be chargeable to, and paid by, said Sub-Contractor, and the Contractor shall have a lien upon all materials, tools, equipment, and appliances taken possession of as aforesaid to secure the payment thereof. Petitioner was bonded on both the Shelby County project and the Butler-Conecuh Counties project to secure performance of the contracts and to secure payment of labor and materials on the respective projects. Bryant was not bonded on either of these projects. Construction on the Shelby County project was begun in February 1959 and on the Butler-Conecuh Counties project in April 1960. Later in that year Bryant ran into financial difficulties and became delinquent in the payment of Federal taxes. On September 16, 1960, a tax levy was served on petitioner and demand was made for the surrender of certain properties and funds in his possession belonging to Bryant. Bryant was financially unable to pay the tax. Petitioner borrowed $42,000 from a bank in Montgomery, Alabama, and paid the said deficiencies in order to release the levy and allow the work to continue on the projects. Petitioner *172 took a second mortgage on Bryant's home and on certain road construction equipment. In September 1960 Bryant also was unable to meet the payments due on his equipment and he was delinquent in his payments for materials and supplies. On or about September 28, 1960, petitioner, in view of Bryant's financial difficulties, assumed authority for purchasing materials and supplies and for making necessary equipment repairs and exercised general supervision over the projects. Purchases of material and supplies were billed directly to petitioner, who made the payments for such items as well as all necessary payments for equipment and labor on the projects. Bryant and his employees continued to work on both projects until they were completed, although the payroll accounts were prepared and paid by petitioner. The equipment used on the projects remained in Bryant's name. From September 1960 until February 1961 all expenditures made by petitioner in connection with these projects were entered on petitioner's books and records as charges to Bryant and all payments on estimates for work done by Bryant were credited to Bryant. After February 1961, petitioner charged the payments for labor, material, *173 supplies and payments on equipment directly to job costs and credited job costs with estimates due Bryant. These payments made by petitioner after September 28, 1960 were also recorded on Bryant's books in a separate journal as job expenditures and the estimates due Bryant for work done were also recorded on Bryant's books. After September 28, 1960, petitioner did not make any payments to Bryant of funds received from Caldwell on the Butler-Conecuh Counties job and from the State of Alabama on the Shelby County job. On June 1, 1962, petitioner and Bryant (individually and as president of three Bryant corporations) executed an agreement which provided, in part, as follows: WHEREAS, said Dozier claims that said companies are indebted to him in the approximate amount of Three Hundred Fifty Thousand Dollars, which said alleged indebtedness is secured by first or second chattel mortgages on equipment owned by said companies, and by a second mortgage on Bryant's home, and WHEREAS, a serious dispute has arisen between the parties as to the credits between them and their respective rights and liabilities with the result that said Dozier has caused to be prepared legal proceedings to *174 foreclose said mortgages, and said Bryant and said companies have retained counsel to resist any such proceedings and to institute a countersuit for damages for alleged breach of contract, * * *
NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES, and the mutual covenants herein contained, the parties agree as follows: 1. The companies agree that they shall forthwith properly execute and deliver to the said Dozier a bill of sale containing full covenants of warranty usually contained in such instruments in Montgomery County, Alabama, conveying the items of machinery and contractors' equipment as more particularly described on the attached schedule marked Exhibit "A", and incorporated in and made a part of this agreement as though set out at length herein, which said conveyance will be made subject to the various existing indebtednesses against said pieces of equipment as set forth on said schedule, which said indebtednesses will be assumed by the said Dozier. Said conveyance shall be executed and delivered no later than five days from date. 2. Upon receipt of the bill of sale described in paragraph one above, the said Dozier agrees that he will enter upon the margin of that *175 certain mortgage recorded in the Montgomery County Probate Office executed by the said Bryant and wife, in his favor, in the original amount of $42,000.00, covering Lot A, according to a resubdivision as recorded in said Probate Office in Plat Book 11, at page 110, a credit in an amount sufficient to reduce the total balance of said mortgage to $20,000.00, it being the parties' intention that said real estate shall be subject to a mortgage in favor of Dozier in the amount of $20,000.00, said mortgage to be due and payable six months from date, and to bear interest at 6% per annum after maturity. 3. The said Dozier further agrees that upon delivery of said bill of sale to him, he shall simultaneously return to Bryant all shares of stock in said companies pledged or assigned to him by the said Bryant. * * *
5. All retainage held by the State of Alabama and any other account receivable due by the State Highway Department or other agency of the State of Alabama, or due by the federal government or any highway project on which the said Dozier was prime contractor and any of said companies was subcontractor, are and shall be and become the sole and separate property of the said *176 Dozier, and the said Bryant and each of said companies shall have no further claim, right, title or interest thereto. * * * 7. Upon full performance of the foregoing covenants and conditions undertaken and assumed by each of the parties to this agreement, each releases the other from any and all liability, claim or demand on account of any matter arising out of the past, up to and including the present time. The said Dozier shall accept the above described bill of sale as a credit against the indebtedness of said companies to Dozier in the amount of (1) $150,000.00; (2) Real estate mortgage in the amount of $20,000.00; and retainage held by the State of Alabama heretofore referred to in paragraph five. After the retainage is ascertained, the amount of said retainage, the $150,000.00 credit, the $20,000.00 mortgage, and the retainage shall be subtracted from the total indebtedness of said companies to Dozier and of said Bryant to Dozier, and the difference shall be a loss to the said Dozier. However, this settlement is a release of any amount due Dozier by said companies and Bryant (except for said $20,000.00 real estate debt), and said companies and Bryant release the said *177 Dozier from any claim or liability for equipment rental, work and labor done, breach of contract, or any other matter arising out of the past. The said Dozier agrees that in support and evidence of this release he will satisfy of record at the Montgomery County Probate Office all chattel mortgages executed in his favor by each of said companies, upon delivery of the aforesaid bill of sale and upon delivery of physical possession of equipment to be conveyed to him. 8. The said Dozier simultaneously with the execution and delivery of said bill of sale will execute and deliver to Bryant the necessary instruments to cancel the assignment of policies of life insurance previously assigned to him by the said Bryant as collateral security, and will deliver to Bryant any of said policies held by him. In Exhibit "A" attached to the agreement the various items of equipment were listed at their appraised values which totalled $154,750.68, with total encumbrances on such equipment in the amount of $4,750.68. In a letter dated August 16, 1961, the State of Alabama Highway Department notified petitioner that all work on the Shelby County project had been "satisfactorily completed" and that *178 "you are hereby notified that the work was accepted by the State Highway Department as of August 9, 1961." A prior letter (dated April 11, 1961) from the State of Alabama Highway Department to petitioner had also notified him that the work had been completed and that the State Highway Department would assume maintenance as of August 9, 1961, subject to their double check on materials and workmanship which was then still in progress. Petitioner was not required to do any further work on the Shelby County project. The State of Alabama Highway Department admitted liability for final payment to petitioner on the Shelby County contract in the amount of $17,386.53 in 1961. Petitioner claimed that he was entitled to $136,646.78. The State Highway Department refused to pay the larger amount and petitioner refused to accept the smaller amount. As a result of the disagreement, the entire amount allegedly due and owing petitioner was in dispute. The dispute involved the amount of earth moved on the project and the distance it had been moved. On July 10, 1962, and on October 15, 1962, the State Highway Department, after further checking, made payments to petitioner in the respective amounts *179 of $40,662.34 and $10,931.75 in settlement of the amount due him on the Shelby County project. Because of this disagreement as to the correct amount due him, petitioner did not report the Shelby County project as closed in 1961. Instead, he reported the Shelby County project on his 1962 Federal income tax return as closed in that year. Respondent determined in his statutory notice of deficiency that the Shelby County project was closed in 1961 and that petitioner realized taxable income in 1961 from the Shelby county contract in the amount of $105,757.32. In view of our holding, which will later appear, that petitioner was right in reporting the Shelby County project as closed in 1962, a year that is not before us, we make no finding with respect to respondent's socalled "adjustments" in computing the profit on the Shelby County contract if it had been reportable in 1961. They were not adjustments to any report of income or loss on the Shelby County job. Apparently, they were adjustments to petitioner's book entries for the determination of deficiencies here involved was based on an audit made in 1962 by respondent's agent before petitioner had closed out his income on the Shelby *180 County contract. In the course of the trial petitioner's retained copy of the 1962 return was placed in evidence by stipulation for the limited purpose of an alternative valuation issue that is not reached. Petitioner reported in his Federal tax return for 1961 a loss of $58,254 from the Butler-Conecuh Counties contract which was closed in that year. Respondent determined that petitioner realized a gain of $6,962.17 on this project. It is stipulated that the difference between the loss reported by petitioner and the gain determined by respondent represented payments of $65,216.98 made to equipment dealers to cover installment or rental payments due on equipment acquired by J. R. Bryant. Respondent disallowed deductions claimed by petitioner for these payments with the explanation that such payments were advances to J. R. Bryant rather than deductible expenses. Opinion In computing his gain or loss on the Butler-Conecuh contract which was completed in 1961, petitioner deducted the payments he made to equipment dealers (in the total sum of $65,216.98) to cover installment or rental payments due on equipment acquired by Bryant. It is petitioner's position that (1) the payments to *181 the equipment dealers were payments of items of ordinary and necessary business expenses and, (2) if said payments constituted advancements to Bryant giving rise to no more than a debt owed by Bryant to petitioner then the debt was a business debt which became worthless in 1961. Respondent contends the payments were not business expenses but admits the payments constituted a business debt which he contends became worthless in a year later than 1961. In support of his first contention that the payments to the equipment dealers constituted deductible business expense, petitioner argues that when the payments were made (after September 28, 1960) Bryant was a defaulting subcontractor and he, petitioner, was in the business of completing the projects and therefore the expenses were deductible as his business expenses within the holding of Commissioner v. John Thatcher & Son, 76 F. 2d 900 (C.A. 2, 1935). We cannot find under this record that Bryant was a defaulting subcontractor or that petitioner is to be treated as entering the business of completing the projects after Bryant encountered financial difficulties in September of 1960. Bryant was petitioner's subcontractor *182 on both projects. [1]Bryant supplied the necessary equipment, materials and labor for the highway construction. Work was begun on the Shelby County job in February 1959 and on the Butler-Conecuh Counties job in April 1960. Within a few months Bryant encountered unexpected terrain difficulties on the Butler-Conecuh Counties job which slowed considerably the progress being made and, in addition, slowed the estimates being received on the job. Bryant encountered financial difficulties and was unable to meet payments on his equipment or to meet other expenses. He became delinquent in the payment of Federal income taxes and petitioner was compelled to borrow $42,000 to release certain equipment from a tax levy. Bryant continued to do the work on the two projects as before with his equipment and his labor force but in view of Bryant's lack of funds the petitioner undertook to make the payments for supplies, labor, materials and equipment in the following manner: As the work on the two jobs had progressed petitioner had received periodic *183 payments or estimates from Caldwell on the Butler job and the State of Alabama on the Shelby job. Prior to September 28, 1960, petitioner merely paid Bryant's share of estimates received to Bryant. After Bryant's delinquent income taxes were paid and the levy released on September 28, 1960, petitioner made no more payments of funds received from Caldwell on the Butler job and from the State of Alabama on the Shelby County job, to Bryant. Instead, he used such funds to pay the expenses on said jobs and to the extent such funds were not sufficient to satisfy the job costs he paid the balance from his own funds and the entries in his books and in Bryant's books show such payments were treated by both parties as debts due petitioner by Bryant. The $65,216.98 expended by petitioner for equipment acquired by Bryant is evidently the total payments by petitioner in excess of the progress payments received by petitioner and credited to Bryant on the Butler job and used by petitioner to pay job costs. After September 1960, when petitioner no longer made actual payments to Bryant, he credited the estimates for work done by Bryant either to Bryant's account on petitioner's books or to job costs *184 and, similarly, charged the expenditures either to Bryant's account or to job costs. This method of accounting for the expenditures on the jobs and the estimates received was reflected on Bryant's books. It also appears from Bryant's books that amounts paid or deposited by petitioner while the work was in progress were recorded on Bryant's books as accounts payable to petitioner. We are convinced on the basis of all the evidence that the petitioner and Bryant intended to create a debtor-creditor relationship. Where a taxpayer makes expenditures under an agreement, tacit or otherwise, that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses. As pointed out, both petitioner and Bryant reflected this understanding in their methods of accounting for the expenditures and the estimates received for work done. In addition, the evidence shows that petitioner, as collateral for his expenditures made on Bryant's behalf, took back a second mortgage on Bryant's home and on certain road construction equipment. Bryant also pledged or assigned to petitioner certain shares of stock as well as policies of life insurance. *185 Finally, after the two projects were completed the parties executed an agreement in June 1962 to settle matters between them. Petitioner stated in the agreement that Bryant was "indebted" to petitioner in the approximate amount of $350,000 and that the "indebtedness" was secured by certain collateral. In settlement of this obligation, Bryant agreed to convey a number of items of machinery and contractors' equipment with an appraised value of $150,000 to petitioner and to give up any further claim to all retainages in connection with the highway construction projects. Petitioner also retained a mortgage on Bryant's home in the amount of $20,000 payable within 6 months. It was agreed that the retainages, the $150,000 credit for the equipment and machinery and the $20,000 mortgage "shall be subtracted from the total indebtedness" of Bryant and his corporations to petitioner, and it was further agreed that "this settlement is a release of any amount due Dozier by said [Bryant corporations] and Bryant (except for $20,000.00 real estate debt), and said [Bryant corporations] and Bryant release the said Dozier from any claim or liability for equipment rental, work and labor done, breach *186 of contract, or any other matter arising out of the past." It was probably open to petitioner under his contracts with subcontractor Bryant to treat Bryant as a defaulting subcontractor and, after completing the projects himself under the alternative methods laid out in the contracts, he could have recovered damages from Bryant under breach of contract principles. In that event, petitioner's expenses incurred by him in completing the work of a defaulting subcontractor would ordinarily be deductible as ordinary and necessary business expenses or as a business loss. See Commissioner v. John Thatcher & Son, supra, and V. & M Homes, Inc., 28 T.C. 1121 (1957), affirmed 263 F. 2d 837 (C.A. 6, 1959). But the parties here chose to create a debtor-creditor relationship, which they were free to do, and consequently the rule of the above cases cannot be applied here. We believe that the above business debt did not become worthless in any part until the settlement agreement reached by the parties in June 1962, at which time it became apparent that Bryant was able to meet only a portion of his indebtedness to petitioner in the approximate amount of $350,000. *187 There is nothing in the record, apart from Bryant's lack of funds apparently brought about by the unexpected difficulties encountered on the projects, to show that the obligations became to any extent worthless prior to 1962. The next issue is whether the Shelby County project was properly closed by petitioner in 1962 for tax reporting purposes or whether, as respondent contends, the project should have been reported as closed in 1961. Petitioner used the completed contract method of accounting for income realized from his highway construction contracts. [2]
The completed contract method of accounting is a permissible departure from the annual system of reporting income. *188 It is particularly adapted to a business fulfilling contracts which overlap accounting periods where the ultimate gain or loss cannot be accurately determined until the completion of the contract. Although the work on the Shelby County project was completed in August 1961, the parties were far apart on the amount of the final payment due petitioner. Petitioner claimed $136,646.78 and the State of Alabama Highway Department would admit a liability of only $17,386.53, and the dispute was so severe that petitioner refused to accept the smaller amount with the result that the entire $136,646.78 remained in controversy. This is therefore not a case where the parties were in agreement as to part of the amount involved and were in disagreement only as to the balance. Rather, this is a situation where the entire gross amount of $136,646.78 was in dispute in 1961. The dispute involved the amount of earth moved on the project and the distance it was moved. The State Highway Department agreed to recheck its computations and in 1962, after making new mass diagrams and computations of the work done, prepared new estimates and on July 10, 1962, and October 15, 1962, made payments to petitioner of *189 $40,662.34 and $10,931.75, respectively, in settlement of the amount due him on the Shelby County project. Under these circumstances we find that the petitioner was correct in closing the Shelby County job into income in 1962. Ordinarily a contract cannot be said to be completed until the parties to the contract have performed all of their contractual obligations. There is no merit in respondent's argument on brief that the date when the actual work was completed in 1961 fixes the completion and "that the contract should be closed for tax purposes in that year and all payments together with the $17,386.53 offered in final settlement should have been reported in the taxable year 1961." Respondent seems to be saying that for tax purposes something less than full performance of the obligation to pay will be sufficient to render the contract completed; that the amount offered in final settlement and refused will be a substitute for the final amount payable. While it is true that a contract could be said to be completed when the work was finished and a reasonably accurate estimate of the final amount that would be paid could be made, that could not be said here. [3] It is obvious there *190 existed no facts in 1961 from which any reasonably accurate approximation of the final payment could be made. The parties were far apart in their claims on the final amount that should be paid. We do not understand respondent to argue that it was possible for petitioner in 1961 to fully ascertain the total income from the contract. He must, under respondent's argument, accept the admitted liability as the end payment for the purpose of reporting in the year the work was completed even though petitioner received nearly three times this admitted liability. To accept respondent's argument would defeat the very purpose of the completed contract method of reporting, i.e., a matching of income received and expense items generated by the performance of a contract. The *191 gain or loss on the Shelby contract was simply not determinable until 1962. Since we have held the gain or loss on the Shelby County contract was not reportable in 1961, respondent's determination of the amount of such gain or loss does not concern us here. To the extent that respondent's determination of deficiency in 1961 is based upon the Shelby County contract profit or loss, the same is error. Decision will be entered under Rule 50. Footnotes
1. Bryant testified that he and petitioner "have been working together ever since the first job I ever got in my life" and that this occurred in 1948.↩
2. Section 1.451-3(b)(2), Income Tax Regs., provides as follows: Completed Contract Method. Gross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted. Under this method, there shall be deducted from gross income for such year all expenses which are properly allocable to the contract, taking into account any material and supplies charged to the contract but remaining on hand at the time of completion.↩
3. The 1942 Memorandum Opinion of Stirton-Oman cited in petitioner's brief holds that where the work on a highway contract was completed in October but the final estimate and payment were not made until the following January 5, the taxpayer-contractor, on the completed contract basis, properly used the latter date as fixing the accrual because the final payment was not susceptible of accurate estimate until January.↩